**Leszek BURZYNSKI, Plaintiff,**

v.

**Thomas TRAVERS, Terence O'Leary and Miam Productions, Defendants.**

No. 85 CV 717.

United States District Court,
E.D. New York.

March 10, 1986.

Bragar & Wexler, New York City by Paul D. Wexler, for plaintiff.

Peter W. Hill, Oneonta, N.Y., for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

### THE NATURE OF THE CASE

The alleged breach of a contract to direct a television movie precipitated this action which came on for a bench trial on November 12, 1985. The Court's jurisdiction arises under 28 U.S.C. § 1332(a)(2), as plaintiff is a citizen of the United Kingdom, defendants are citizens of the State of New York and the amount in controversy exceeds $10,000.

### FACTUAL BACKGROUND

The parties to this litigation were collaborators in the production of a television film, entitled, "Miracle in a Manger." Defendant Thomas Travers (Travers) wrote the screenplay; defendants Miam Productions, a New York limited partnership and Terence O'Leary [1] (O'Leary) were responsible for the financing of the production.

When the project was first conceived in the summer of 1984 Travers selected Leszek Burzynski (Burzynski), a British director with both BBC and American television credits, to direct the picture. Burzynski and Travers signed a letter agreement dated August 22, 1984. (Pl's Ex. 1). The agreement provided that Burzynski's services would be exclusively available from August 22 through September 15, 1984 for a stated fee of $25,000 payable in two installments, plus reimbursement of reasonable pre-production and production period expenses and 5% of the net profits of the film. If defendants were unable to obtain financing prior to September 15, the parties agreed that Burzynski would "be offered first refusal to direct." Pl's Ex. 1.

Travers was ultimately unable to obtain financing by the September 15 deadline. In October 1984 O'Leary, a practicing attorney in Walton, New York, became a general partner in Miam Productions and spearheaded the fund-raising efforts. Apparently by mid-November defendants had obtained sufficient backing to proceed with production and by letter dated November 12, 1984 defendants offered plaintiff the position of director. (Pl's Ex.2).

The terms of the offer were $15,000 payable weekly, purportedly reflecting offers the defendants had received from "other persons." Pl's Ex. 2. Following Travers' signature at the end of the letter was an acceptance clause with a blank signature line.

In a reply dated November 20, 1984, Burzynski wrote that he was "thrilled to hear

---

**1.** O'Leary did not become a co-producer and general partner in Miam Productions until Octo-ber 1984 and so was not involved in the initial negotiations.

... that financing of 'Miracle in A Manger' [was] progressing steadily," and he indicated that the "offer of a $15,000 fee [was] acceptable ... in consideration of the sacrifices [Travers was] personally making to see this film become a reality." Pl's Ex. 3. Burzynski did suggest that the method of payment be in two installments as per the original agreement and that a points participation arrangement be retained. He did not sign the November 12 letter agreement, but drafted a new signature page incorporating his suggested changes. (Pre-Trial Order Ex. B–4).

Deeming these variations from the terms of the offer to be a counteroffer whose terms were unacceptable, *see* Pl's Ex. 4, defendants proceeded to secure the services of another director—in this instance, Mr. Travers, himself.

Subsequently, on March 5, 1985 Burzynski sued the defendants for breach of contract. In their answer and at trial, defendants' first affirmative defense was that they had complied with the terms of the original agreement because the $15,000 offer to Burzynski was a bona fide offer to direct, and when Burzynski rejected it he terminated his right of first refusal and extinguished the letter agreement.

## DISCUSSION

### A. Contract Interpretation.

In the interpretation of contracts, the paramount aim of the court is to discern and implement the intent of the parties. To that end the court will examine the four corners of the document and consider parol evidence to clarify ambiguous terms and amplify the parties' intent. Our goal is to achieve a " 'practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations.' " *Tantleff v. Truscelli*, 110 A.D.2d 240, 244, 493 N.Y.S.2d 979, 983 (2d Dep't 1985) (citation omitted).

Applying these principles to the case at bar, we look first at the document itself. The language of the August 22, 1984 letter agreement between Travers and Burzynski does not set forth with specificity the operating mechanics of the right of first refusal. The pertinent portion reads:

> For my part I agree to make my directing services available to you exclusively on a first call basis from the date of this letter above until September 15th 1984 inclusive during which period you will endeavour to raise financing for the project. Should you not be in a position to contract my services during the exclusive period detailed above, I would regrettably be unable to guarantee my services as director on MIRACLE IN A MANGER. However, should the production be financed subsequently, you agree that I will be offered first refusal to direct.
>
> You and I acknowledge this letter to be a binding agreement between us and witnessed as such by our signatures below. We further state our intention to enter into a full contract regarding directing and other services I may render in connection withn MIRACLE IN A MANGER and which will set out all the customary and particular obligations and agreements between us.

Pl's Ex. 3. No terms spell out the notice provisions; no clause details whether the right was triggered by a bona fide third party offer, and if so there is no mention of the alternatives if an acceptable bona fide third party offer was not forthcoming.

In his post-trial memorandum of law, plaintiff gives the following interpretation of the agreement:

> If the film was financed after September 15, 1984, the parties contracted that Burzynski would either: (a) direct the film for $25,000; or (b) have the right to match any bona fide offer from a third party who was a competent professional director. If the financing was obtained and defendants had no bona fide offer from a third party, they were obligated to employ Burzynski, who had already spent time and effort on the project, at the stated contract price.

Pl's Memo. at 5.

Defendants' interpretation of the contract, like the wind on Long Island Sound,

is variable. In their post-trial memorandum,

> [t]he defendants' position is that the August 22, 1984 agreement (hereinafter "letter agreement") had a "stated fee" only for the plaintiff's services if financing were available up to September 15, 1984, after which time the plaintiff would have the opportunity of first refusal to direct, but that the defendants had a duty only to offer the plaintiff that right of first refusal on the same basis that another director would be willing to direct the project.

Def's Mem. at 2.

In their post-trial reply memorandum, submitted two weeks later, defendants' interpretation of the contract had changed dramatically:

> Of course, if there is any ambiguity in the contract, it must be construed against the author of that agreement, here the plaintiff. What he received was only the right of first refusal. The plaintiff chose not to insert any language that the defendant had to receive an offer from a competent professional director.
>
> \* \* \* \* \* \*
>
> No proof was offered by the plaintiff that the defendants even had to have an offer from anyone before they were to give the plaintiff the first refusal to direct. No evidence of the custom and usage or interpretation of the phrase, "first refusal to direct" was presented by the plaintiff, even though he had both the plaintiff and defendant Travers called as witnesses, and the phrase could easily mean simply that the defendants could not have someone else direct the project at a fee higher than that which was offered to the plaintiff.

Def's Reply Mem. at 2–3.

The Court is thus confronted with an array of sources upon which to draw in its task of conjuring up the parties' intentions as they are embodied in the August 22 letter agreement. In arriving at its interpretation the Court relies not only on the document and parol evidence, but on common usage and common sense.

 A right of first refusal is generally defined as the "right to meet any other offer." BLACK'S LAW DICTIONARY 1191 (5th ed. 1979). Through its frequent appearance in contracts, particularly those pertaining to real estate, this right has been the repeated subject of judicial scrutiny and in the common law has acquired its own arcane meaning. The holder of such a right is usually deemed to be entitled to match any acceptable bona fide third party offer received by the tendering party. *See generally,* 1A A. CORBIN, CORBIN ON CONTRACTS § 261 (1963). Common usage, the plaintiff, and the defendants in their original post-trial memorandum all present a consistent interpretation, and the Court holds that Burzynski's right of first refusal entitled him to meet any bona fide third party offer to direct that was acceptable to the defendants.[2]

 If, therefore, defendants had a bona fide offer to direct at $15,000 whose terms they offered to Burzynski for first refusal, no breach occurred. Plaintiff concedes this and argues in the alternative that if the offer was legitimate, he properly accepted because in his November 20 reply, (Pl's Ex. 3), he agreed to the fee, the "only terms of the alleged offer he knew about." Pl's Mem. at 8. Plaintiff's suggestions as to payment terms and a points participation arrangement were simply inquiries about terms which had been part of the original agreement and were omitted from defendants' cryptic November 12 communication. *Id.*

Thus, the factual question of whether there was a bona fide offer is the legal pivot point of this case. If there was a bona fide third party offer and defendants'

---

2. The letter agreement is devoid of details, nor did the trial presentations or the post-trial briefs focus on the event that no bona fide offer was received and defendants obtained financing and proceeded with the project. The Court attributes this to the fact that in the November 12 letter Travers states that they "had offers from other persons to direct for Fifteen Thousand dollars." Pl's Ex. 2.

subsequent offer to Burzynski mirrored its terms, the Court would then have to resolve whether Burzynski's November 20 letter was an acceptance or a counteroffer.

A review of recent New York case law revealed that in a similar case involving a right of first refusal the Court of Appeals held that where an optionee agreed to the same price and payment terms offered by a third party, but varied the security collateralizing the deferred payments, the acceptance was "not upon the same terms and conditions 'necessary to properly invoke the right of first refusal.'" *Camden Co. Ltd. v. Princess Properties, Int'l Ltd.,* 38 N.Y.2d 961, 963, 348 N.E.2d 609, 610, 384 N.Y.S.2d 152, 153 (1976).

In the case at bar the variation was equally critical. Although a change in method of payment may not have been material, plaintiff's request for 3½% of the net profits from the movie which plaintiff estimates would be $1,650,000, *see* Pre-Trial Order Ex. C, would amount to an additional $57,750—a substantial difference from the terms of the offer. This Court, deciding the issue as would a New York State Court, *see Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), is compelled to conclude that there was no acceptance by the plaintiff, merely a counteroffer which was unacceptable to defendants. A rejection of an offer upon like conditions as those of a bona fide offer made by a third party would satisfy and terminate plaintiff's right of first refusal. *See, e.g., Allright New York Parking, Inc. v. Shumway,* 94 A.D.2d 962, 963, 463 N.Y.S.2d 968, 970 (4th Dep't 1983).

Conversely, if there was not a bona fide third party offer, then the defendants in effect perpetrated a fraud on the plaintiff,[3] and in all likelihood on the investors as well. In order to raise capital, the defendants circulated a private placement memorandum describing their venture and the people involved. (Pl's Ex. 7). The placement memorandum states that Burzynski had the right of first refusal to direct and his resumé was attached as an appendix. Absent proof of a bona fide third party offer, a strong presumption arises that defendants used plaintiff's name in wooing investors and once the financing was in place, "they attempted to wriggle out of the contract based upon vague 'offers' from unidentified 'other persons.'" Pl's Mem. at 4.

In summary, if there was a bona fide offer, the case must be decided in favor of the defendants, while an opposite outcome is warranted if there was no bona fide offer.

### B. Allocating The Burden of Proof.

The allocation of the burden of proof on this issue is critical to the outcome of the litigation. Based on the pleadings and the opening statements[4], this Court has determined that the defendant had the burden of proving that a bona fide offer was received and was in existence.

Defendants acknowledged their burden at the trial and attempted to meet it by introducing into evidence a letter from Mr. William Rebane, an independant producer and owner of a studio facility in Wisconsin called "The Shooting Ranch, Ltd," offering to direct for $15,000. The Court refused to accord the document any weight because proof of a material fact may not be accomplished through hearsay. Fed.R.Evid. 802.

---

**3.** The defendants concede as much:

Certainly, the defendants would have been committing a fraud if they had stated to the plaintiff that they had received offers from other person when in fact they had not and then they attempt [sic] to have the plaintiff agree to a contractual fee based upon a representation that they had received such offers. Def's Reply Mem. at 4.

**4.** In his opening statement to the Court, counsel for defendants, Peter Hill, offered his interpretation of Pl's Ex. 2—the November 12 letter from Travers to Burzynski:

[I]t clearly said, "you have the right to direct at the sum of $15,000." He [Travers] had received offers from other persons to direct for that same amount. There was an honest committment to provide the plaintiff with first right of refusal.
Trial Tr. at 8.

Rebane's letter, clearly "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Fed.R.Evid. 801(c), is not within any of the hearsay exceptions enumerated in Rules 803 or 804, hence, it is not admissible proof.

■ Recognizing that testimonial proof with its attendant right of cross-examination was required in order to satisfactorily establish whether Mr. Rebane was a ready, willing and able director, and to prevent defendants from defrauding the plaintiff and wrongfully extinguishing an enforceable legal right, *see, e.g., Loika v. Howard,* 103 A.D.2d 874, 875, 477 N.Y.S.2d 919, 921 (3d Dep't 1984), the Court offered defendants the opportunity to subpoena Mr. Rebane for a deposition that could then be used as evidence. Trial Tr. at 12–13, 41–44.

Defendants declined to exercise this option. The attorney for defendants rested his case at the conclusion of the one day trial and has made no application to submit newly discovered evidence on the issue of the bona fide third party offer. Because the defendants shouldered the burden of proof on this issue, the failure to introduce any cognizable evidence of a $15,000 bid to direct from a third party means that their affirmative defense fails and they are liable to the plaintiff for breaching the August 22, 1984 letter agreement.

C. Damages.

■ The defendants having breached the contract are liable to the plaintiff for contract damages. However, notwithstanding the claim in his post-trial reply memorandum to 5% of the net profits of the film, (Pl's Reply Mem. at 4), Burzynski's damages are limited to $25,000. At the outset of the trial plaintiff's attorney waived plaintiff's claim for reimbursement of reasonable pre-production expenses, if any, and 5% of the net profits of the film. *See* Trial Tr. at 3, 5 ("I would like to say that there are elements of our damage claim which we have decided to withdraw ... We are alleging in our pretrial order to delete

our claim for consequential damages. This case really involves $25,000.").

■ As for the defendants' claim that any damage award should be reduced by the amount of reasonable expenses the plaintiff would have incurred in carrying out the contract, (Pl's Reply Mem. at 9), the Court directs attention to the contract itself which states that in addition to the $25,000 fee, Burzynski would be reimbursed for all "reasonable expenses during the period ... production." Pl's Ex. 1. Hence, no deduction from the $25,000 is appropriate.

## CONCLUSION

Based on the foregoing discussion of the pertinent facts and law, this Court finds that plaintiff is entitled to a judgment in this action and to contract damages of $25,000 with interest to be calculated from the date of entry of the judgment.

SO ORDERED; submit judgment on notice.