**USA CABLE, Plaintiff Below, Appellant,**

v.

**WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., Viacom Inc., and CBS Corporation, Defendants Below, Appellees.**

**No. 327, 2000.**

Supreme Court of Delaware.

Submitted: Aug. 14, 2000.
Decided: Sept. 18, 2000.

---

David C. McBride, Bruce L. Silverstein, Danielle Gibbs, Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware, of counsel, Herbert M. Wachtell, Marc Wolinsky, George T. Conway III, Elaine P. Golin, Jed I. Bergman, Wachtell, Lipton, Rosen & Katz, New York City, for appellant.

Robert K. Payson, Arthur L. Dent, Potter Anderson & Corroon LLP, Wilmington, Delaware, Jerry S. McDevitt, Terry Budd, Curtis B. Krasik, Kirkpatrick & Lockhart LLP, Pittsburgh, Pennsylvania, for appellee World Wrestling Federation Entertainment, Inc.

A. Gilchrist Sparks, III, Alan J. Stone, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, of counsel, Richard B. Kendall, Harry A. Mittleman, Robert N. Klieger, Irell & Manella LLP, Los Angeles, California, for appellees Viacom Inc. and CBS Corporation.

Before: VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

VEASEY, Chief Justice:

In this expedited appeal we review a decision of the Delaware Court of Chancery applying New York law to a contract dispute, following a full trial in that Court. The dispute involves the interpretation of the scope of a right of first refusal and the effectiveness of a purported exercise of that right.

This case turns on two questions: (1) whether the right of first refusal is limited to the subject matter of the original contract where the third party proposal added extraneous matters unrelated to that subject matter; and (2) whether the purported exercise by the holder of the right of first refusal matched each of the material terms of the third party offer relating to that subject matter.

The Court of Chancery correctly ruled that the holder of the right is not required to match extraneous parts of a package offered by the third party, but is required to match exactly each of the material terms of the offer relating to the subject matter of the original contract. The Court of Chancery also ruled correctly that the holder of the right of first refusal in this case failed properly to exercise its right.

The essence of this latter ruling of the trial court is that: (1) the third party proffer contained four material terms that related to the subject matter of the original contract; and (2) the purported match by the holder of the right of first refusal was not an exact match of any of those four terms. We agree with the Court of Chancery that the four terms are material. We hold that two of four terms were not matched by the holder of the right. But we differ with the analysis of the Court of Chancery in that we find that there was a match of the other two terms. Nevertheless, because of the failure of the holder of

the right to match all four of the material terms, we hold that the right was not effectively exercised. Accordingly, we affirm the judgment of the Court of Chancery.

### Facts

This case was expedited in the Court of Chancery, and our appellate process has been expedited to accommodate the business timetable of the parties.[1] A four-day trial was held in the Court of Chancery involving live witnesses on disputed and undisputed facts relating to background, business issues, intentions of the parties and their interpretations of language and events. The Court rendered a comprehensive 55–page opinion five days after the submission of the matter.

The Court of Chancery made findings of fact on a number of issues based on an extensive trial record that included live witnesses and credibility determinations. For a thorough exposition of the facts we refer to the opinion of the Court of Chancery.[2] The essential facts, stated most summarily for purposes of this expedited appeal, are as follows:

Since 1983 USA Cable ("USA") has had the contractual right to telecast a series of wrestling events (the "Series") produced by World Wrestling Federation Entertainment, Inc. ("WWFE"). That contract was amended from time to time. In 1998, the parties entered into the latest of 15 contracts (the "Agreement") defining four specific programs of the WWFE Series that USA had a license to distribute.

Section 5(b) of the Agreement contained an exclusive first negotiation/first refusal provision.[3] WWFE later expanded its business strategy. As part of that strategy it sought to exercise the early termination right provided in the Agreement in order to seek strategic alliances commensurate with its new strategy. After some negotiations, the parties agreed to an amendment that would postpone WWFE's timetable for termination, in exchange for which USA relinquished its exclusive first negotiation right, thereby permitting WWFE to negotiate with third parties. But the parties kept intact *in haec verba* USA's right of first refusal, thus requiring WWFE to tender to USA any proposed third party transaction with respect to the Series so that USA would have the opportunity to match that proposed transaction.

USA knew that WWFE would be seeking in any offer from a third party a broad package that would not be strictly limited to the subject matter of the Series. That is what happened. WWFE negotiated an integrated package deal with a third party, Viacom, Inc. ("Viacom"),[4] only part of which related to the subject matter of the Series.[5]

On April 2, 2000, WWFE presented the proposed Viacom transaction to USA, thus providing it an opportunity within the 10–day window set forth in the Agreement to determine whether or not to exercise its right of first refusal. On April 12, 2000,

1. The parties agree that their business considerations would best be served if this Court would release its decision before September 24, 2000, when the current contract expires and before a new television series begins.

2. *USA Cable v. World Wrestling Federation Entertainment, Inc.*, Del.Ch., 2000 WL 875682, C.A. No. 17983, Chandler, C. (June 27, 2000) (Mem.Op.) (Hereinafter "Mem. Op.").

3. *Id.* at 1–6.

4. The third party proposal of Viacom was also made on behalf of CBS Corporation ("CBS"). Viacom and CBS subsequently entered into a merger agreement, so we will simply refer to Viacom for the purposes of this appeal.

5. The extraneous provisions that USA was not required to match included "the XFL, theme park events, and motion pictures, for example." Mem.Op. at 20–21. *See infra* text at note 15. Although USA claimed that it is a breach of contract for WWFE to proffer the expanded deal with extraneous provisions, and that WWFE "laid a trap" for USA, we do not agree. Therefore, our analysis is confined to the scope of the right of first refusal and its exercise.

within that window, USA sent a letter to WWFE purporting to match the Viacom offer with respect to the subject matter of the Series. In that letter and its attachment USA claimed it was exercising its right of first refusal by meeting the relevant and material terms of the offer. That writing, however, contained strikeovers and other alterations that are the crux of this dispute. Simultaneously with the submission of the April 12 letter, USA filed this suit in the Delaware Court of Chancery seeking a declaratory judgment, specific performance and injunctive relief relating to its rights as the holder and purported exerciser of the right of first refusal.[6] After trial, the Court of Chancery entered judgment against USA, and USA appeals to this Court.

### Legal Issues

The initial legal issue under New York law is whether the exercise of the right must be an exact match of all terms.[7]

Although the law is reasonably well-developed in some jurisdictions,[8] New York law is not fully developed on this issue.[9]

We need not resolve this question of New York law, however, because we can assume for purposes of this appeal, without deciding the issue, that New York law requires that the holder of a right of first refusal must match exactly *all the material terms* of a third party offer with respect to the relevant subject matter of the original contract. Thus, failure to meet *immaterial terms* will not defeat the effectiveness of the exercise of the right of first refusal.

### Scope of the Right of First Refusal

■ We turn next to the question whether USA's purported exercise of its right of first refusal was a match of the relevant and material terms of the deal between Viacom and WWFE with respect to the Series, as proffered to USA. The threshold issue is the scope of the right of

---

6. There was no discussion or other contact between USA and WWFE with respect to the April 2, 2000 proposed Viacom transaction and USA's right of first refusal until USA's letter of April 12, 2000. We inquired at oral argument about the reason for the absence of any communication that might have clarified matters. We conclude from the response of USA's counsel that USA's decision not to engage in a dialogue at that time and to proceed as it did was a tactical risk it chose to take in view of uncertain perils.

7. Apparently under New York law the formation of a contract *ab initio* must include exact or "mirror image" matching of the offer by the acceptance, whether or not each term is material. *See Barber–Greene Co. v. M.F. Dollard, Jr., Inc.*, 239 A.D. 655, 269 N.Y.S. 211, 215–216 (3rd Dep't 1934) (citing *Poel v. Brunswick–Balke–Collender, Co.*, 216 N.Y. 310, 110 N.E. 619 (1915)) (articulating the "mirror-image" rule of offer and acceptance); 22 N.Y.Jur.2d Contracts § 52 ("To conclude an agreement [under New York law], the acceptance must meet and correspond with the offer in every respect, neither falling short of nor going beyond the terms proposed, but meeting them exactly at all points and closing them just as they stand."). But this doctrine does not necessarily answer the question in the context of a right of first refusal.

8. *See generally Miller v. LeSea Broadcasting, Inc.*, 7th Cir., 87 F.3d 224, 226–228 (1996) (noting that a majority of cases do not require matching of immaterial terms, and those cases do not "let insubstantial variations between the third party's offer and the right holder's offer defeat the right") (citations omitted).

9. *See Camden Co. Ltd. v. Princess Properties Int'l, Ltd.*, 38 N.Y.2d 961, 384 N.Y.S.2d 152, 348 N.E.2d 609, 610 (1976) (determining that the holder did not properly invoke the right of first refusal because of failure to match "the same terms and conditions contained in the original offer"); *Burzynski v. Travers*, E.D.N.Y., 636 F.Supp. 109, 112–113 (1986) (determining that, if there was a bona fide third party offer, plaintiff could not invoke his right of first refusal because he failed to match the terms and conditions of the original offer); *see generally LIN Broadcasting Corp. v. Metromedia, Inc.*, 74 N.Y.2d 54, 544 N.Y.S.2d 316, 542 N.E.2d 629, 632 (1989) (discussing the operation of a fight of first refusal); *American Broadcasting Co. v. Wolf*, N.Y.App.Div., 76 A.D.2d 162, 430 N.Y.S.2d 275, 280–281 (1st Dep't 1980), *aff'd*, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981) (same); 15A N.Y.Jur.2d Business Relationships § 1486 (same).

first refusal under the Agreement,[10] which provides as follows:

> 5. The term hereof shall commence on September 28, 1998 and shall end on September 23, 2001 (the "Term"). Notwithstanding the foregoing, either party hereto may terminate this Agreement as of September 24, 2000, for any reason whatsoever, by written notice to the other, delivered between March 1, 2000 and March 31, 2000. In no event, however, may [WWFE] enter into any arrangement, understanding or agreement with any such third party *with respect to any or all of the three Series* without first giving to USA a right of first refusal, exercisable within ten (10) business days following receipt by USA of written notice detailing the terms of the third party offer(s), as to any such offer(s) which [WWFE] intends to accept. If USA does not meet such offer(s), [WWFE] will not enter into an Agreement with such third-party on terms less favorable to it than those contained in the offer(s) without again affording USA a first refusal as above provided.[11]

■ The proposed Viacom transaction with WWFE was a "package" deal that included other arrangements beyond the "Series." The Court of Chancery held, in USA's favor, that the language "with respect to any or all of the three Series" [12] in paragraph 5(b) defining the scope of the right of first refusal was intended as restrictive language.[13] This holding is consistent with New York law.[14] As a result, the Court of Chancery held that USA "must match all terms contained in a third party offer directly related to the Series itself." The Court went on to hold:

> For example, USA must match terms detailing scheduling of the Series, licensing fees for the Series, advertising splits for the Series, and terms establishing the length of the contract for the right to distribute the Series. USA need not match terms of a third party offer that relate to *other* subject matters. Other subject matters include the XFL, theme park events, and motion pictures, for example.[15]

In reaching this conclusion, the Court applied the "plain meaning rule," interpreting the language of paragraph 5(b) in the context of the overall instrument.[16] The Court went further and held, alternatively, that the same outcome would prevail in the context of the parol evidence adduced at trial. Accordingly, the Court of Chancery rejected the contention of WWFE and Viacom that USA was obliged to match all provisions of the April 2, 2000 proposal, including the extraneous provisions.[17] We believe the interpretation of the scope of the right of first refusal by the Court of Chancery was clearly correct as a matter of law.

10. As noted, the Agreement was amended in November 1999 to eliminate an exclusive negotiation obligation period between WWFE and USA, but left intact the right of first refusal, changing only the triggering date.

11. Mem.Op. at 18 (emphasis in original).

12. At issue here is "four series." The agreement of July 2, 1998, granted a license to USA to distribute the "three series" entitled "WWF Raw/WWF War Zone," "WWF Live Wire," and "WWF Superstars." In a companion agreement dated September 1, 1998, WWFE granted USA a license to distribute the WWFE program entitled "Sunday Night Heat." These four series are collectively referred to as "the Series" and the two agreements are collectively referred to the "Agreement." Mem.Op. at 5. USA is the number-one-rated basic cable television service in prime time, due in part to the enormous popularity of this WWFE programming it carries. Mem.Op. at 2–3.

13. Mem.Op. at 17–40.

14. Under New York law the right of first refusal is coextensive with the subject matter of the original contract. *See New Atl. Garden, Inc. v. Atlantic Garden Realty Corp.*, 201 A.D. 404, 194 N.Y.S. 34, 40 (1st Dept.1922), *aff'd*, 237 N.Y. 540, 143 N.E. 734 (1923).

15. Mem.Op. at 20–21 (emphasis in original).

16. *Id.* at 18–27.

17. *Id.* at 27–40.

■ The relevant issues, of course, are: What are the material terms within the scope of the Series and did USA match all of them? Determination of the matching issues is a mixed question of law and fact. To the extent that the determination rests on findings of fact, we defer to the findings of the Court of Chancery if they are supported by the evidence and are the product of a logical deductive process.[18] Questions of law we determine *de novo*.[19]

### The Purported Exercise of the Right of First Refusal

We address the following four areas that the Court of Chancery addressed to determine the matching issue, and we discuss them in the same order as did the trial court: (1) territorial rights; (2) choice of law/forum selection; (3) cross-promotion; and (4) preemption. The Court of Chancery found that USA failed to match in all four areas.

■ If the purported match is not an exact match of all the material terms, the exercise of the right of first refusal is ineffective. We agree with the Court of Chancery that the choice of law/forum selection and cross-promotion terms were material, and USA did not match them. We also agree that the territorial rights and preemption terms were material, but we disagree with the conclusion of the trial court that USA did not match those terms. Because we agree that USA did not match two material terms, we affirm the judgment of the Court of Chancery.

#### 1. Territorial Rights

■ The Agreement provides in Section 2 that USA has "the exclusive right to distribute the Programs for the Series within the United States, its territories and possessions (including Puerto Rico) and all U.S. Armed Forces Bases everywhere through the world (the 'Territory') . . . ." The proposed Viacom offer would have added "Canada and the Caribbean," but the purported match by USA deleted the additional territory. The Court of Chancery, in essence, held that the new territory was within the scope of what USA was obliged to match,[20] and it failed to match that provision. We disagree.

The Territory defined in the Agreement (which does not include Canada and the Caribbean) sets the parameters of the matching obligation. The issue is whether the subject matter of the Series is confined to the original territorial parameters of the Series. USA makes a very cogent "correlative" argument: that if WWFE and Viacom simply contracted for Viacom to produce the Series in Canada or the Caribbean and not in the territory covered by the Agreement, USA would not be entitled to a right of first refusal. Therefore, the argument runs, USA is not required to match the portion of a proffered WWFE/Viacom deal that included this additional territory. If matching were required to be coextensive with the enlargement of the territory to Canada and the Caribbean (and the addition would have been significant), that result could conceivably permit enlargement of the territorial provision to any place on the planet.

In effect, the conclusion of the Court of Chancery that would treat the Agreement's subject matter to the Series in isolation without confining the subject matter to the original territory, would undermine USA's right of first refusal. It could, for

18. *See Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972) ("It is only when the findings below are clearly wrong and the doing of justice requires their overturn that we are free to make contradictory findings of fact.") (citation omitted).

19. *See Schock v. Nash*, Del.Supr., 732 A.2d 217, 224 (1999) (stating that conclusions of law are reviewed *de novo*, and factual findings

will be accepted "if they are sufficiently supported by the record and are the product of an orderly and logical deductive process") (quoting *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972)); *Stegemeier v. Magness*, Del. Supr., 728 A.2d 557, 561 (1999) (same).

20. Mem.Op. at 42–44.

example, allow WWFE easily to sidestep USA's right by presenting a package deal it knows USA cannot accept simply by significantly expanding the original territory.

WWFE's presentation of a third party offer to USA may not operate to expand the subject matter of the original agreement, and expanding the territory in this manner does so. It is illogical to condition USA's right of first refusal on its ability to match terms of the Viacom offer falling outside the subject matter of the Agreement.[21] Accordingly, we hold that, as to this issue, the Court of Chancery was incorrect as a matter of law.

### 2. *Choice of Law and Forum Selection*

 In analyzing whether a valid match is made in the purported exercise of a right of first refusal, one must not confuse two separate concepts. First is the correct view that it is necessary for the exercise of the right to be coextensive with the scope of the subject matter of the original contract. Second is the incorrect notion that the holder of the right may insist that the holder need only "mimic" the exact terms of the original agreement and need not match other—even new—provisions in the proffer *that relate to the subject matter.* The Court of Chancery correctly held that "the limit of the first refusal right's scope is not the four corners of the 1998 Agreement itself. Rather, the limit is the subject matter of the Agreement (the four Series)."[22] Although the trial court did not correctly apply that concept to the territorial expansion in the Viacom proffer because that expansion

took the proffer outside the subject matter of the Agreement, the choice of law/forum selection issue is quite different. That provision in the proposed Viacom transaction did not take the proffer outside the subject matter (*i.e.* the Series). We now turn to that issue.

The Agreement provides that New York law governs interpretation and enforcement, but it does not require *exclusive* (only nonexclusive) venue in a New York forum. In the third party proposal, WWFE and Viacom provided that New York law would govern. That proposal added a provision requiring exclusive venue in New York courts. The choice of law/forum selection provision was deleted in USA's purported exercise of its right of first refusal.

In specific language, Viacom's offer provides that "[t]he strategic alliance (and all of the components thereof) shall be governed by New York Law, and each party agrees to submit to the *exclusive* jurisdiction of the courts located in New York." (Emphasis supplied.) By contrast, the Agreement currently in effect provides, in part, that it "shall be construed, interpreted and enforced in accordance with and shall be governed by the laws of the State of New York. . . . [WWFE] hereby submits to the *nonexclusive* jurisdiction of the United States District Court for the Southern District of New York and of any New York State court sitting in New York City for purposes of any legal proceedings arising out of or relating in any way to this Agreement or the transaction contemplated hereby." (Emphasis supplied.)

---

**21.** *See Rome Sav. Bank v. B.W. Husted and Son, Inc.,* 171 A.D.2d 1048, 569 N.Y.S.2d 236, 238 (4th Dep't 1991) (asserting that "first refusal rights are governed by the property description contained in the option contract and are not enlarged by the fact that the landowner has considered selling, or has sold, a larger parcel of which the optioned land forms only a part"); *New Atl. Garden, Inc. v. Atlantic Garden Realty Corp.,* 201 A.D. 404, 194 N.Y.S. 34, 39–40 (1922), *aff'd,* 237 N.Y. 540, 143 N.E. 734 (1923) (asserting that a

right of first refusal to a leased property related to no "other premises than those demised to the tenant under said lease"). Although these cases occur in the real property context, they support the argument that USA was obligated to match the Viacom offer with respect to the "Series" in the defined "Territory" of the Agreement, and that did not include Canada or the Caribbean.

**22.** Mem.Op. at 43–44.

USA makes three arguments to excuse its failure to match these terms: (1) this "same basic concept" is captured in USA undertaking that there would ultimately be a long-form agreement between WWFE and USA containing the "customary covenants, representations, warranties and indemnities" once the right of first refusal was consummated; (2) the choice of law provision was sought by Viacom (not WWFE) in its negotiations with WWFE; and (3) the Court of Chancery could condition relief upon USA's agreeing to those terms.

Contrary to USA's assertion, there are no provisions in its purported exercise to interchange with the exclusive venue [23] term and the promise of a long-form agreement incorporating "boilerplate" provisions is not the equivalent of the acceptance of these specific terms.[24] Nor is USA's failure to match excused on the ground that the term was material only to Viacom. The proffered transaction was on behalf of both entities. Finally, it is not a valid argument that USA matched this term because a court of equity can condition relief on USA's acceptance of a term it rejected in purporting to exercise the right. This argument incorrectly confuses equity practice in other contexts with principles of contract law.

The Court of Chancery held that choice of law and forum exclusivity are material terms relating to the original subject matter, and that USA did not match those terms.[25] We agree with the trial court that choice of law and forum selection clauses are material under New York law.[26] USA's arguments that attempt to justify its removal of this term are without substantial merit. The Court of Chancery was clearly correct in its holding that USA failed to match this material term.

### 3. Cross–Promotion

The Viacom cross-promotion term provides that Viacom ". . . agrees to cross-promote the WWF programming contemplated hereunder across its various media platforms and outlets (including television, radio and billboards). The level of such cross-promotion shall be determined on an annual basis, with Viacom preparing an annual cross-promotion plan which shall be reviewed with WWFE." USA struck all three cross-promotional platforms and outlets (i.e., television, radio and billboards) from its purported match of the Viacom offer, but added, equivocally, the phrase "as well as any additional promotion."[27]

The Court of Chancery held that USA failed to match the cross-promotional obligations of the Viacom proposal that were material and directly related to the Series.

**23.** Even if we assume that the New York choice of law provision would necessarily be part of a new WWFE/USA deal pursuant to the terms of USA's exercise of its right because that provision is in the Agreement, the exclusive venue provision was new. It is an important and material term. For example, it would have precluded a Delaware action like this one.

**24.** The fact that Viacom introduced the choice of law term cannot, standing alone, lead to the conclusion that the term was not material to WWFE.

**25.** Mem.Op. at 44–46.

**26.** See Marlene Indus. Corp. v. Carnac Textiles Inc., 45 N.Y.2d 327, 408 N.Y.S.2d 410, 380 N.E.2d 239, 242 (1978) (providing reasoning, that can be extended to choice of law provisions, as to why an arbitration clause is material to parties in a commercial transaction); see also Reeves Bros., Inc. v. Capital–Mercury Shirt Corp., S.D.N.Y., 962 F.Supp. 408, 412–13 (1997) (determining that the removal of a choice of law provision materially altered the contract under the U.C.C.); General Instrument Corp. v. Tie Manufacturing, Inc., S.D.N.Y., 517 F.Supp. 1231, 1235 (1981) (finding a "choice of forum clause materially alters the contract within the meaning of New York U.C.C. § 2–207(2)" and that the "bench and bar has always regarded choice of forum as a significant right"); Lorbrook Corp. v. G & T Indus., Inc., 162 A.D.2d 69, 562 N.Y.S.2d 978, 980 (1990) (determining that forum clause addition never became part of the contract under the U.C.C. because it materially altered the agreement).

**27.** Mem.Op. at 46–47

The Court concluded: "Ultimately, therefore, I am not persuaded that USA's equivocal match of portions of the cross-promotion provision in Viacom's offer constitutes an unconditional acceptance. Instead I find that USA effectively made a counteroffer to WWFE regarding the form and type of promotion it would provide under the agreement."[28] USA contends that the Court of Chancery erred when it determined that USA had not manifested valid acceptance of a cross-promotion term in Viacom's offer. USA argues that the trial court misconstrued USA's attempted match, that the cross-promotion term was "ephemeral and undefined" and that the term dragged in extraneous programming that went outside the subject matter.

The record illustrates that WWFE had successfully used the various media platforms, including billboards, to advertise some of its other events. Aware of the success with using these methods of cross-promotion, WWFE wanted to use all of these platforms to cross-promote the Series. Viacom was prepared to employ its own resources to that end. USA apparently was not.

It is arguable whether USA itself could have cross-promoted via radio or on billboards because it does not control radio or billboard media sources. This does not, however, mean that USA could not cross-promote on these platforms by contracting with a third party for radio time and billboard space. The fact that the cross-promotion term in the Viacom proffer refers to "its [Viacom's] various media platforms," not simply various media platforms, does not create a situation where it is impossible for USA to match. Although USA may not have had the *internal* capability to provide the cross-promotion required to match the Viacom proposal, it

had the capability to contract with others to do so. The Court of Chancery found that USA did not agree unequivocally to do so.

The cross-promotion term related to the subject matter of the Series and was a business condition that was important to WWFE. USA effectively treated cross-promotion as an immaterial term, and the Court of Chancery correctly found this was a material term relating to the subject matter of the Series. Therefore, USA's match must provide an unequivocal commitment to cross-promotion that is substantially equivalent to the Viacom proposal.[29] Instead, USA struck all three cross-promotion provisions in their entirety, and its commitment (such as it was) was equivocal. Accordingly, the Court of Chancery was clearly correct in holding that USA failed to match the material cross-promotion provision.[30]

#### 4. *Preemption*

The proposed Viacom transaction included a commitment that there would be "no regularly scheduled preemptions." USA's April 12, 2000 letter matched this provision word-for-word. The Court of Chancery found "as a matter of fact and law," however, that USA failed to match unconditionally this term of the Viacom offer.[31] The basis of this holding is not USA's written response, which was clear and unequivocal. Rather, the trial court found that the trial testimony cast doubt on the bona fides of USA's subjective intention to honor its word-for-word match.

On appeal, USA argues that since it matched the Viacom preemption provision word-for-word, under New York law "that ends the inquiry." We agree with USA and hold that as a matter of law the word-

---

**28.** *Id.* at 46–48.

**29.** *Id.* at 47.

**30.** USA's claim that, even if it failed to match the Viacom offer's cross-promotion provision, such failure was excused due to indefiniteness

also lacks merit. In our view the provision was sufficiently definite to be understood and implemented, and in any event WWFE was entitled to unequivocal response.

**31.** Mem.Op. at 50.

for-word match and the plain meaning of "regularly scheduled" support a complete and sufficient match. The Court of Chancery's finding from the testimony that USA did not intend to perform is problematic in this context.

The Court of Chancery based its finding that there was a non-match by USA of the preemption term in the Viacom offer primarily on the testimony at trial. That testimony addressed several discrete issues: (a) WWFE's clear desire not to have the Series preempted at any time;[32] (b) in the past USA had preempted WWFE programs for events such as the Westminster Kennel Club Dog Show and the U.S. Tennis Open, and that these preemptions were a problem that WWFE wanted to eliminate so that its Series would run uninterrupted 52 weeks per year; (c) testimony of a WWFE witness quoting a USA executive to the effect that WWFE will "have to live with" U.S. Open and Dog Show preemptions beyond the 1999–2000 television series; and (d) the fact that these statements "infuriated the McMahons [WWFE principals] who have characterized USA's pur-

ported match of Viacom's no preemption term as 'a lie.'"[33] The Court of Chancery concluded on this record that USA's literal acceptance of the "no regularly scheduled preemption term" was a "sleight of hand" that was not done in good faith and that its attempt to pay off the U.S. Open to honor the clause was a "last ditch" or "eleventh hour" argument.[34]

In analyzing the preemption issue in this manner and predicating his decision on findings "as a matter of fact and law" that were "based on my assessment of the testimony at trial and the situation of the parties," the trial judge apparently would have us apply a deferential scope of review to his fact-finding on appeal.[35] But we must review these findings and holdings to determine if they are correct as a matter of law (a *de novo* review), if they are supported by evidence in the record and if they are the product of a logical, deductive process.[36]

Normally our scope of review of factual findings accords great deference to the trial judge who heard live testimony and

**32.** The finding of the trial court on this issue is not problematic. The record shows that it was important to WWFE that its programming not be interrupted by programs that preempt its telecasts. WWFE witnesses testified that the nature of the Series involves a continuum akin to that of the plot line of a "soap opera." Thus the record supports the finding of the trial court that it is essential to WWFE that the continuum not be interrupted so that WWFE would not risk losing or disappointing its followers. There is no way to prevent preemptions caused by national emergencies or disasters. But WWFE wanted to avoid preemption by "regularly scheduled" programming of other events.

**33.** That precise testimony of Mr. McMahon, WWFE's principal, on these issues is as follows:

Q. Has any member of the USA corporate executive staff ever given you any admission, if you will, that they cannot change that practice because they are contractually bound to continue those preemption practices?

A. ... But that whole issue of preemption is a major one for us and one that Stephen Chao [USA executive] has indicat-

ed that we're just going to have to live with, which is why, one of the reasons when I glanced at what USA sent in terms of their answer to the Viacom deal. As Linda [McMahon] said, there was all kind of scratch marks and all that sort of stuff. It's like when you read the no regularly scheduled preemption stuff, come on, U.S. Open, I've been told, is a regularly scheduled preemption. There's no doubt about that. That's for two weeks. And the dog show is a regularly scheduled preemption in February every year.

Q. And did you form any opinions after you read their purported match of that language?

A. Yeah. Again, I was disappointed because, you know, again, they're lying. You know, that bothered me.

Trial transcript. pp. 1221–22.

**34.** Mem.Op. at 48–50.

**35.** *Id.*

**36.** *See* cases cited *supra* note 19.

evaluated the credibility of witnesses.[37] Here, however, there is a threshold question whether it was a valid legal analysis for the trial court to permit its interpretation of the testimony to "trump" the written record where USA made a word-for-word match. The issue is whether the written terms must control. If USA never unequivocally repudiated the word-for-word match made in its April 12, 2000 writing, should the trial court have considered the equivocal oral testimony upon which it rested its finding?

USA's unambiguous acceptance of the written preemption term was an objective manifestation of USA's intent to be bound by the term.[38] Because New York law requires courts to look to the objective manifestations of intent (*i.e.*, the unambiguous written term), not the parties' subjective or real intentions,[39] we must decide whether the Court of Chancery improperly relied on the oral testimony at trial as demonstrating the parties' subjective intent where objective manifestations control.[40]

To determine this issue we must parse the trial court's analysis. USA argues that the Court of Chancery looked to ex-trinsic evidence, not to resolve an ambiguity, but to conclude that USA did not mean what it said in its written and unequivocal acceptance of the "no regularly scheduled preemption." They argue that it was improper in all events for the trial court to look to WWFE's concern with historical problems with preemption to determine whether USA would honor its commitment in the future. The most difficult issue for us to review in the trial judge's analysis is his reliance on the testimony of a WWFE executive that a USA executive said that WWFE would "have to live with" some preemption and that WWFE witnesses thought USA executives were "lying." [41]

The trial court relied on parol evidence of the historic preemption problems and the ambiguous record on USA's intentions to honor this commitment as a predicate for its finding that USA's written acceptance of the "no regularly scheduled preemption" was not a match.

At bottom, the record shows that there was uncertainty about the full import of the term "regularly scheduled." This was a new term injected into the matter by WWFE and Viacom, and there is no evidence that this term had an accepted

---

**37.** *Id.*

**38.** *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977) ("In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of intent of the parties as gathered by their expressed words and deeds."); *see also Kenyon v. Delman*, N.D.N.Y., 38 F.Supp.2d 107, 110 (1998) (same); 22 N.Y.Jur.2d Contracts § 30 ("The manifestation of the parties' intention rather than the actual or real intention is ordinarily controlling. In considering these manifestations of intent, the fact finder should not put disproportionate emphasis on any single act, phrase or other expression but, instead, on the totality of these given the attendant circumstances....") (footnote omitted).

**39.** *See Mencher v. Weiss*, 306 N.Y. 1, 114 N.E.2d 177, 181–182 (1953) (" 'If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held [to those words], unless there were some mutual mistake, or something else of the sort.' ") (citation omitted); *see also In the Matter of Smith*, 85 Misc.2d 849, 380 N.Y.S.2d 888, 890 (Special Term I 1976) ("The most tangible manifestation of the intentions of parties to a contract is the written instrument itself, and consequently the words in a contract are not to be ignored in determining those intentions.") (citation omitted).

**40.** The trial court acknowledges this general principle. Mem.Op. at 46. *See, e.g., Conopco, Inc. v. Wathne Ltd.*, 190 A.D.2d 587, 593 N.Y.S.2d 787 (1st Dep't 1993); *Brown Bros. Elec. Contractors Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977); *accord, Eagle Industries v. DeVilbiss Health Care, Inc.*, Del.Supr., 702 A.2d 1228, 1232 (1997).

**41.** *See supra* note 33.

meaning within the television industry. Since it was a WWFE/Viacom "creation" with no "gloss" in the industry it should be construed in accordance with its ordinary dictionary meaning. According to conventional dictionary definitions the adverb "regularly" means "1. at regular times or intervals. 2. according to plan, custom, etc. 3. usually; ordinarily." [42]

It is clear from the record that USA intended to manage to avoid regularly scheduled preemption not only by paying off the U.S. Open but also by reducing its commitment to the Westminster Kennel Club to one dog show over a period of 260 Monday nights. That one instance is not, in our view, at regular intervals. Thus it is not a "regularly scheduled preemption." In all events it is *de minimus* on this record. Likewise, we agree with USA that WWFE's historic concerns with preemptions by USA for the Open and the Dog show are not a proper basis for the trial court's finding that USA undermined its commitment going forward that there would be no regularly scheduled preemptions.

 Finally, the trial court's characterizations of USA's conduct as "sleight of hand," absence of "good faith," "last ditch" and "eleventh hour," do not appear to be supported by the record and do not reflect a logical and deductive process on this issue *in this context*. What we mean by "in this context" is that here we have a written contract (USA's word-for-word acceptance of the "no regularly scheduled preemption") and a solid basis under New York law that parol evidence cannot change the objective manifestation of USA's unambiguous commitment in that writing. Under New York law that objective manifestation must control, absent some extraordinary circumstances (such as a clear and written repudiation), that are not present on this record. The mere fact that the trial court couched its finding in part on the determination of witness credibility does not render its ruling impervious to attack on appeal. Accordingly, we find that the Court of Chancery erred as a matter of law in its holding that USA did not match the term requiring "no regularly scheduled preemption."

### The Court of Chancery's Further Findings

The Court of Chancery described USA's behavior generally as "opportunistic," that it used a "pretext," that it was "over-reaching," and that its "self-serving tactical decisions should not evoke judicial sympathy." [43] We need not review these findings. Whether or not these findings are supportable or were offset by equities in USA's favor, they were not necessary to the Court of Chancery's conclusions, and reversal of them would not reverse the result. We rest our affirmance solely on the correct determination by the Court of Chancery as a matter of law that USA failed to match two terms of the WWFE/Viacom proffer: the choice of law/forum selection provision and the cross-promotion provision.

### Conclusion

Since we find at least two instances where USA did not match, the right of first refusal was not effectively exercised. Accordingly, we affirm the judgment of the Court of Chancery.

---

**42.** *See, e.g.,* RANDOM HOUSE UNABRIDGED DICTIONARY 1624 (2d ed.1993); *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 985 (10th ed.1997).

**43.** Mem.Op. at 50–53.