# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-10344

United States Court of Appeals
Fifth Circuit

**FILED**

March 12, 2018

Lyle W. Cayce
Clerk

CENTERBOARD SECURITIES, L.L.C.,

Plaintiff - Appellee

v.

BENEFUEL, INCORPORATED,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CV-2611

Before KING, ELROD, and GRAVES, Circuit Judges.

PER CURIAM:*

Centerboard Securities, LLC, sued Benefuel, Inc., for breach of a financial services agreement, alleging that Benefuel did not pay success fees on two transactions covered under the agreement. The district court held a bench trial. It found that these transactions were indeed covered by the contract and that FHR Treasury I, LLC—the entity that invested in these

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-10344

transactions—did not qualify as a current investor under the agreement. Accordingly, it concluded that Benefuel owed Centerboard the full seven percent success fee on both of these transactions. We AFFIRM.

## I.

Benefuel, Inc. ("Benefuel"), is an alternative energy company. In January 2011, Benefuel entered into a joint venture with Flint Hills Resources Renewables, LLC ("FHR Renewables"), to retrofit a biodiesel plant in Beatrice, Nebraska. On December 1, 2013, Benefuel entered into an agreement with Centerboard Securities, LLC ("Centerboard"). Under the agreement, Centerboard would act as Benefuel's "financial advisor" and provide Benefuel with "financial advice and assistance in connection with a Transaction, including (i) identifying and contacting potential investors and/or strategic partners, (ii) assisting [Benefuel] in its consideration and analysis of a Transaction and (iii) assisting [Benefuel] in its negotiation of the financial aspects of a Transaction." Transaction is defined as "an investment in [Benefuel] or in another vehicle (including, but not limited to, Beatrice Funding, LLC) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development and/or the Beatrice, Nebraska biodiesel project." The term "investment" is not defined.

The agreement stated that Benefuel would pay Centerboard as compensation a "work fee" and a "success fee." The work fee consists of (1) a cash work fee of $15,000 per month and (2) an equity work fee of "$15,000 per month, payable in equity at the Transaction price, and due upon successful completion of a Transaction." The success fee is "7% of any Aggregate Investment, payable in cash at the time cash proceeds of such investment are received (reduced by the amount of the cash work fee paid)." "Aggregate Investment" is "the total amount of all investments received in connection with a Transaction and shall include any amounts committed during the term of

2

this Agreement or during the Tail Period and funded subsequent to the expiration of this Agreement." Again, the term "investment" is not defined.

The "Tail Period" is the 12-month period following the date of termination. The agreement terminated on December 31, 2014. Accordingly, the Tail Period was January 1 to December 31, 2015. The agreement stated that Centerboard would be entitled to success fees for "Transaction[s]" entered into during the Tail Period.

Moreover, if the "Aggregate Investment is provided by any of Hercules Technology Growth Capital, Suncor Energy Inc., SilverLake Management LLC, Black Corral Capital or CHS Inc. or the affiliates of each of the foregoing," the success fee will be reduced from seven to five percent. "[F]or current investors of [Benefuel] or any investment vehicle related to the Beatrice project, the 7% Success Fee will be applied to only that Aggregate Investment which increases their pro rata equity ownership" ("pro rata ownership clause"). The term "current investors" is not defined.

In December 2014, Centerboard initiated this action against Benefuel in New York state court. In January 2015, Benefuel removed this suit to the Southern District of New York, which then transferred this suit to the Northern District of Texas in August 2015. Centerboard filed an amended complaint in January 2016. It alleged, inter alia, that Benefuel breached the agreement by (1) not paying the equity work fee from July to December 2014; (2) not paying the success fee for the "mezzanine transaction"; and (3) not paying the success fee for the "2015 transaction." The "mezzanine transaction," which occurred in December 2014, involved the issuance of units comprised of secured promissory notes and warrants. That is, the mezzanine transaction was comprised of debt and equity. The primary purchaser in this transaction was FHR Treasury I, LLC ("FHR Treasury"), an affiliate of FHR Renewables. FHR Renewables and FHR Treasury are subsidiaries of Flint Hills Resources,

No. 17-10344

LLC ("Flint Hills"), which is a subsidiary of Koch Industries, Inc. ("Koch"). While FHR Renewables was an investor of Benefuel's as of the date of the agreement (i.e., December 1, 2013), FHR Treasury was formed six months after this date (i.e., in June 2014). The "2015 transaction," which occurred in December 2015, consisted of a convertible promissory note with debt and equity aspects. FHR Treasury also invested in this transaction.

The district court held a bench trial on October 7, 2016. On January 20, 2017, it ruled against Centerboard with respect to the equity work fee claim, but ruled in favor of Centerboard on the two success fee claims. Specifically, with respect to the success fee claims, the district court concluded that "investment" unambiguously includes equity and debt and, thus, Benefuel's refusal to pay Centerboard success fees for the mezzanine and 2015 transactions constituted a breach of the agreement. The district court also concluded that "current investor" unambiguously "refer[s] to only those entities who had invested in Benefuel at the time the agreement was signed" and does not include FHR Treasury. Accordingly, it determined that Centerboard was entitled to the full seven percent success fee on both of these transactions. On January 23, 2017, the district court entered judgment and awarded Centerboard $1,900,500 on the mezzanine transaction and $420,000 on the 2015 transaction—plus pre- and post-judgment interest. Subsequently, Benefuel filed a motion for reconsideration or, alternatively, for a new trial. The district court denied this motion. Benefuel now appeals the district court's rulings on the success fee claims.

## II.

The agreement was executed in Texas but contains a choice of law clause that states any disputes arising out of the agreement shall be governed by Delaware law. "A federal court is required to follow the choice of law rules of the state in which it sits." *Resolution Tr. Corp. v. Northpark Joint Venture*, 958

4

F.2d 1313, 1318 (5th Cir. 1992) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Under the Texas rules, in those contract cases in which the parties have agreed to an enforceable choice of law clause, the law of the chosen state must be applied." *Id.* (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)). Thus, the district court properly applied Texas choice of law rules, and Delaware law governs this dispute.

This court reviews the district court's findings of fact for clear error and conclusions of law de novo. *See Conn. Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 483 (5th Cir. 2017). This court reviews "matters of contract interpretation *de novo.*" *Habets v. Waste Mgmt., Inc.*, 363 F.3d 378, 382 (5th Cir. 2004) (citing *HS Res., Inc. v. Wingate*, 327 F.3d 432, 440 (5th Cir. 2003)). "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). When interpreting a contract, Delaware courts give "'priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions." *Id.* at 368 (quoting *GMG Capital Invs., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)). "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Id.* (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). "When a term's definition is not altered or has 'no "gloss" in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning.'" *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (alteration in original) (quoting *USA Cable v. World Wrestling Fed'n Entm't, Inc.*, 766 A.2d 462, 474 (Del. 2000)).

No. 17-10344

"A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*." *Id.* "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "[W]here reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence." *GMG Capital Invs.,* 36 A.3d at 783. "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus.,* 702 A.2d at 1232.

We begin by examining whether the mezzanine and 2015 transactions are covered under the agreement. A transaction covered under the agreement is defined as "an investment in [Benefuel] or in another vehicle (including, but not limited to, Beatrice Funding, LLC) or through an extraordinary transaction with any of the foregoing to fund [Benefuel's] corporate development and/or the Beatrice, Nebraska biodiesel project." The term "investment" is not defined. Benefuel argues that the term "investment" is limited to equity and, thus, the mezzanine and 2015 transactions—both of which have aspects of debt and equity—are not covered transactions. We disagree.

The term "investment" is unambiguous and includes debt and equity. Nothing in the dictionary definitions of "investment" limits it to equity. *See, e.g.*, Investment, *Black's Law Dictionary* (10th ed. 2014) ("An expenditure to acquire property or assets to produce revenue; a capital outlay"); Investment, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ("the outlay of money

usu[ally] for income or profit"); Investment, *American Heritage Dictionary* (4th ed. 2000) ("property or another possession acquired for future financial return or benefit"). The agreement specifies "equity" in different clauses for different purposes (e.g., in the equity work fee clause and pro rata ownership clause). Therefore, not expressly limiting "investment" to equity suggests that the term includes debt.

Further, Delaware courts have used the term "investment" to refer to equity and debt. *See, e.g.*, *In re Nine Sys. Corp. S'holders Litig.*, No. CIV.A. 3940-VCN, 2014 WL 4383127, at \*6 (Del. Ch. Sept. 4, 2014) ("The equity investment proposal shared with [the shareholder] shifted to a possible debt investment."), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015) (unpublished table decision); *Greenwald v. Batterson*, No. 16475, 1999 WL 596276, at \*2 (Del. Ch. July 26, 1999) (describing an investment of money that could be made through the purchase of bonds or debt that is convertible to stock). We thus conclude that the term "investment" includes equity and debt. Accordingly, the mezzanine and 2015 transactions both qualify as transactions under the agreement, and Centerboard is therefore entitled to success fees for them.

Next, we determine how the success fees should be calculated (i.e., whether Centerboard is entitled to the full seven percent success fee or a modified amount). The agreement states that "for current investors of [Benefuel] or any investment vehicle related to the Beatrice project, the 7% Success Fee will be applied to only that Aggregate Investment which increases their pro rata equity ownership." The term "current investors" is not defined. Benefuel contends that if the mezzanine and 2015 transactions are covered under the agreement, then FHR Treasury should be considered a "current investor[]" in the calculation of the success fees. We disagree.

No. 17-10344

The term "current investor" is unambiguous and does not include FHR Treasury. According to *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003), the term "current" means "occurring in or existing at the present time." *See also* Current, *American Heritage Dictionary* (4th ed. 2000) ("belonging to the present time"). According to *Black's Law Dictionary* (10th ed. 2014), the term "investor" means "[a] buyer of a security or other property who seeks to profit from it without exhausting the principal" or "[b]roadly, a person who spends money with an expectation of earning a profit."[1] Put together, the plain meaning of "current investor" is an entity—which exists at the present time—that spends money with an expectation of earning a profit. As the date of the agreement was December 1, 2013, the entity must have existed as of this date. FHR Treasury was formed in June 2014, about six months after the date of the agreement. Therefore, FHR Treasury was not a "current investor."

Benefuel specifically contends that "current investor" should encompass Koch and Flint Hills and their subsidiaries. This argument is unavailing. It is clear that FHR Renewables was a "current investor" at the time of the agreement, as it was listed on Benefuel's stock register at that time. Benefuel, however, has not shown why Koch, Flint Hills, or FHR Treasury should be treated as the same entity as FHR Renewables under the contract, disregarding corporate formalities. In fact, Delaware law—which governs this dispute—takes corporate formalities quite seriously. *See Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012) ("Delaware courts take the corporate form and corporate formalities very seriously . . . [and] will disregard the corporate form only in the 'exceptional case.'" (quoting *Case Fin., Inc. v. Alden*, No. 1184, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009))). Further,

---

[1] Other dictionaries, such as *Merriam-Webster's Collegiate Dictionary* and *American Heritage Dictionary*, do not include a separate definition for "investor." Instead, "investor" is treated as a form of the word "invest."

the agreement specified that the success fee should be reduced from seven to five percent if the "Aggregate Investment is provided by any of Hercules Technology Growth Capital, Suncor Energy Inc., SilverLake Management LLC, Black Corral Capital or CHS Inc. or the *affiliates* of each of the foregoing" (emphasis added). This suggests that "current investor" does not include affiliates of the entities that were investors at the time of the agreement, as the parties did not specify this. Thus, FHR Treasury was not a "current investor," even though it was an affiliate of FHR Renewables. Accordingly, Centerboard is entitled to the full seven percent success fee on the mezzanine and the 2015 transactions.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

9