# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HUMC HOLDCO, LLC, HUMC PROPCO, LLC, HUMC OPCO, LLC, HUDSON HOSPITAL HOLDCO, LLC, CH HUDSON HOLDCO, LLC, HUDSON HOSPITAL PROPCO, LLC, HUDSON HOSPITAL OPCO, LLC, and IJKG OPCO, LLC,

        Plaintiffs,

        v.

MPT OF HOBOKEN TRS, LLC, MPT OF HOBOKEN HOSPITAL, LLC, MPT OF HOBOKEN REAL ESTATE, LLC, MPT OF BAYONNE, LLC, AVERY EISENREICH, WTFK BAYONNE PROPCO, LLC, SB HOBOKEN PROPCO, LLC, ALARIS HEALTH, LLC, and J.C. OPCO, LLC,

        Defendants.

HUMC OPCO, LLC,

        Nominal Party,

        and

J.C. OPCO, LLC, on behalf of itself and derivatively on behalf of Nominal Defendants HUDSON HOSPITAL OPCO, LLC d/b/a CHRIST HOSPITAL and CH HUDSON HOLDCO, LLC, MPT OF HOBOKEN TRS, LLC, and MPT OF HOBOKEN HOSPITAL, LLC,

        Counterclaim-Plaintiffs,

C.A. No. 2019-0972-KSJM

|                                                          | )  |
| v.                                                       | )  |
|                                                          | )  |
| HUDSON HOSPITAL HOLDCO, LLC, and                         | )  |
| HUMC HOLDCO, LLC,                                        | )  |
|                                                          | )  |
|     Counterclaim-Defendants,         | )  |
|                                                          | )  |
| and                                                      | )  |
|                                                          | )  |
| VIVEK GARIPALLI, JAMES LAWLER,                           | )  |
| JEFFREY MANDLER, SEQUOIA HEALTH                          | )  |
| MANAGEMENT, LLC, and CAREPOINT                           | )  |
| HEALTH MANAGEMENT ASSOCIATES,                            | )  |
|                                                          | )  |
|     Third-Party Defendants,          | )  |
|                                                          | )  |
| and                                                      | )  |
|                                                          | )  |
| HUDSON HOSPITAL OPCO, LLC d/b/a                          | )  |
| CHRIST HOSPITAL and CH HUDSON                            | )  |
| HOLDCO, LLC,                                             | )  |
|                                                          | )  |
|     Nominal Defendants.              | )  |

## MEMORANDUM OPINION

Date Submitted:  May 28, 2020
Date Decided:  July 2, 2020

Susan M. Hannigan, Robert L. Burns, Ryan D. Konstanzer, Megan E. O'Connor, RICHARDS, LAYTON & FINGER, P.A. Wilmington, Delaware; *Counsel for Plaintiffs HUMC Holdco, LLC, HUMC Propco, LLC, HUMC Opco, LLC, Hudson Hospital Holdco, LLC, CH Hudson Holdco, LLC, Hudson Hospital Propco, LLC, Hudson Hospital Opco, LLC, and IJKG Opco, LLC.*

Michael P. Kelley, Andrew S. Dupre, McCARTER & ENGLISH, LLP, Wilmington, Delaware; Michael A. Ackal, III, D. Scott Funk, GRAY REED & MCGRAW LLP, Houston, Texas; *Counsel for Defendants MPT of Hoboken TRS, LLC, MPT of Hoboken Hospital, LLC, MPT of Hoboken Real Estate, LLC, MPT of Bayonne, LLC.*

Patricia L. Enerio, Jamie L. Brown, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Christopher J. Sullivan, Dominic J. Picca, LisaMarie Collins, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C., New York, New York; *Counsel for Defendants Avery Eisenreich, WTFK Bayonne Propco, LLC, SB Hoboken Propco, LLC, Alaris Health, LLC, J.C. Opco, LLC.*

**McCORMICK, V.C.**

The parties to this action are part of an intricate web of people and entities that own, operate, and lease real estate to three hospitals located in Hudson County, New Jersey. The defendants moved for judgment on the pleadings on four counts in the complaint. This decision resolves that motion as to a single count asserted by Hoboken HUMC against Hoboken MPT for breach of Hoboken Opco's LLC Agreement.[1] That count arises from an offer by Alaris Health ("Alaris") to acquire Hoboken MPT's membership interests in Hoboken Opco. An early version of the offer conditioned the sale of the membership interests on the sale of real estate owned by other defendants. After the real estate sales closed, Alaris issued a second version of the offer, which sought to acquire the membership interests only.

The offer from Alaris triggered Hoboken HUMC's right of first refusal under Hoboken Opco's LLC Agreement. The provision grants Hoboken HUMC the right to acquire the membership interests on "the same terms and conditions" stated in the Alaris offer. The parties dispute whether the scope of Hoboken HUMC's first-refusal right extends to the real estate sales. The parties also dispute what constitutes a qualifying offer and whether the initial first-refusal notice could be withdrawn after

---

[1] "Hoboken Opco" is HUMC Opco, LLC, "Hoboken HUMC" is HUMC Holdco, LLC, and "Hoboken MPT" is MPT of Hoboken TRS, LLC. Before diving into the background, it bears noting that the caption of this case includes nearly twenty Delaware limited liability companies, the names of which seem like they were selected by a random acronym generator resulting in a swirling bowl of alphabet soup. To mitigate the dizzying effect, this decision adopts defined terms and, for the most part, leaves off the "LLC" at the end of each of the entity parties' names.

Alaris revised its offer. This decision concludes that although the scope of the first-refusal right is limited to the membership interest sale, questions of fact concerning the terms and conditions of that sale, and questions of fact and law concerning the operative qualifying offer, foreclosing judgment on the pleadings in favor of the Hoboken MPT. The defendants' motion as to this issue is therefore denied.

This decision also addresses a secondary dispute concerning a provision of the LLC Agreement that restricts a member's ability to transfer governance rights. Alaris's offer included a term prohibiting Hoboken MPT from consenting to any amendments to the LLC Agreement without Alaris's prior written consent. Hoboken HUMC claims that this term constitutes an effective transfer of governance rights in breach of the LLC Agreement. The defendants' motion as to this issue is also denied because questions of fact and law foreclose judgment on the pleadings.

## I. FACTUAL BACKGROUND

The background facts are drawn from the parties' pleadings and the documents they incorporate by reference.[2]

### A. The Parties

Hoboken Hospital, Christ Hospital, and Bayonne Medical Center are acute care facilities located in Hudson County, New Jersey. Each hospital is owned and operated by a corresponding limited liability company, which this decision refers to

---

[2] *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. 2006).

respectively as Hoboken Opco, Christ Opco,[3] and Bayonne Opco.[4] Each hospital leases real estate from a corresponding limited liability company, which this decision refers to respectively as Hoboken Propco,[5] Christ Propco,[6] and Bayonne Propco.[7]

The plaintiffs own "founders' interests" in the Opcos and Propcos. Of the long list of plaintiffs, only one is relevant to this decision: Hoboken HUMC, which owns the founders' interest in Hoboken Opco.

The equally long list of defendants can be grouped into two categories: the "MPT Defendants" and the "Eisenreich Defendants."[8] The only MPT Defendant relevant to this decision is Hoboken MPT, which owns a membership interest in Hoboken Opco. The Eisenreich Defendants relevant to this decision are Avery Eisenreich and Alaris, an entity controlled by Eisenreich. Eisenreich indirectly owns an interest in Christ Opco and is a member of the Christ Propco board of managers.

---

[3] "Christ Opco" is Hudson Hospital Opco, LLC.

[4] "Bayonne Opco" is IJKG Opco, LLC, an entity wholly owned by IJKG, LLC.

[5] "Hoboken Propco" is MPT of Hoboken Real Estate, LLC.

[6] "Christ Propco" is Hudson Hospital Propco, LLC.

[7] "Bayonne Propco" is MPT of Bayonne, LLC.

[8] The MPT Defendants are: MPT of Hoboken TRS, LLC, MPT of Hoboken Hospital, LLC, MPT of Hoboken Real Estate, LLC, and MPT of Bayonne, LLC. The Eisenreich Defendants are: Avery Eisenreich, WTFK Bayonne PropCo, LLC, SB Hoboken PropCo, LLC, Alaris Health, LLC, and J.C. OpCo LLC.

3

## B.    The Governing Provisions

Hoboken HUMC and Hoboken MPT are parties to Hoboken Opco's LLC Agreement.[9] Section 10 of that agreement is titled "Transfer of Interest." Two parts of Section 10 are relevant to this decision.

*First*, Section 10.5 grants each member a right of first refusal in the event that any other member seeks to transfer any of its interests in Hoboken Opco. A member receiving a qualifying "Offer" under Section 10.5 is obligated to notify Hoboken Opco's General Manager, who must then notify the other members. Upon receiving the notice, the members have fifteen days to exercise the right to "purchase all (but not less than all) of the Membership Interests proposed to be sold upon the same terms and conditions stated in the Offer."[10]

*Second*, Section 10.1 restricts the transfer of any governance or financial rights of a membership interest in Hoboken Opco to any third party, except as permitted under the agreement.

## C.    The Sales Process

Beginning in 2018, the hospitals experienced financial difficulties. The parties to this lawsuit explored strategic alternatives, including a potential sale of various entities and assets. In September 2019, RWJ Barnabas Health, Inc.

---

[9] Am. Compl. Ex. A.

[10] *Id.* § 10.5(a).

4

("Barnabas") expressed interest in acquiring Hoboken Hospital and Christ Hospital from Hoboken Opco and Christ Opco. Any transaction was contingent upon negotiating new leases with Hoboken Propco and Christ Propco.

After Barnabas expressed interest in a transaction, Eisenreich became involved in the negotiations. The plaintiffs allege that Eisenreich led them to believe that he intended to use his relationship with Barnabas executives to "develop a plan that would permit Christ Hospital and Hoboken Hospital to seamlessly close on a transaction with [Barnabas], allow Christ Hospital to meet its interim funding needs to get to a closing with [Barnabas], and provide Bayonne Medical Center with significant funds and rent concessions to be able to continue operations while [Bayonne] searched for a strategic partner."[11]

The plaintiffs further allege that Eisenreich convinced the plaintiffs to turn over confidential information pertaining to the three hospitals. After receiving the information, Eisenreich began communicating separately with Barnabas about interest in a transaction and a new lease with Christ Propco. Eisenreich did not report the separate negotiations to the other members of the Christ Propco board of managers. The plaintiffs further allege that Eisenreich "directed representatives of [Barnabas] not to communicate with any other [Christ] Propco Manager or with any

---

[11] C.A. No. 2019-0972-KSJM, Docket ("Dkt.") 28, First Am. Verified Compl. ("Am. Compl.") ¶ 108.

representative of [Christ] Propco concerning new terms for a lease at Christ Hospital."[12] Although the other board members reminded Eisenreich that they had "not consented to anyone speaking with [Barnabas] about the . . . transactions," Eisenreich ignored them.[13]

### D. The First EPA and First Notice

Eisenreich allegedly used the hospitals' confidential information to engineer transactions between the MPT Defendants and Alaris. On October 15, 2019, the Eisenreich Defendants and the MPT Defendants executed a confidentiality agreement in connection with ongoing discussions of a potential transaction. Hoboken MPT ultimately determined to accept Alaris's offer to purchase its membership interest in Hoboken Opco (the "Membership Interest" and the "Membership Interest Sale"). The Membership Interest Sale was cross-conditioned on Alaris purchasing the Hoboken and Bayonne real estate from Hoboken Propco and Bayonne Propco (the "Real Estate" and the "Real Estate Sales").[14]

The package deal was memorialized in an Equity Purchase Agreement dated October 27, 2019 (the "First EPA"). The First EPA listed a purchase price of $8,275,000 for the Membership Interest Sale and purchase prices of $50 million and

---

[12] *Id.* ¶ 215.

[13] *Id.* ¶ 169.

[14] Am. Compl. Ex. E §§ 1.1, 8.1(g); Am. Compl. ¶ 122.

$58 million for the Real Estate Sales. The First EPA also prevented Hoboken MPT from approving an amendment to the LLC Agreement "without the prior written consent of [Alaris]."[15]

The defendants closed on the Real Estate Sales on November 5, 2019, before the defendants notified the plaintiffs of any offer to purchase the Membership Interest or the existence of the First EPA.

On November 8, 2019, Hoboken MPT sent the plaintiffs an email stating that they were required to speak with Eisenreich regarding any matters related to the Membership Interest. This was the first that the plaintiffs caught wind of any transaction between Hoboken MPT and Eisenreich. The plaintiffs responded by demanding that Eisenreich provide them with documents pertaining to his putative interest in Hoboken Opco. Eisenreich refused.

To obtain more information concerning Eisenreich's dealings, on November 19, 2019, a member of the Christ Propco board noticed a board meeting for 2:30 p.m. on November 22, 2019.[16] The notice stated that the "nature of the business to be transacted at the [m]eeting" would include "the status and substance

---

[15] Am. Compl. Ex. E § 5.7.

[16] *See* Dkt. 80, Aff. of Christopher J. Sullivan, Esquire in Supp. of the Eisenreich Defs.' Mot. for J. on the Pleadings Ex. C. The Court can consider this document for the purposes of this motion because the Amended Complaint incorporates it by reference. *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) (explaining that the Court may consider "documents integral to or incorporated into the complaint by reference" on a Rule 12(c) motion).

of all discussions or negotiations that any Manager of [Christ] Propco (or their affiliates or representatives) have had or are continuing to have with [Barnabas]."[17] The members of the Christ Propco board demanded to learn from Eisenreich the substance of his communications with Barnabas.

That same day, Eisenreich sought to delay the meeting. He explained that a Friday afternoon meeting conflicted with his religious observance of the Jewish Sabbath. He asked that the meeting be rescheduled for November 26, 2019.

The MPT Defendants used the delay to send notice of the First EPA to Hoboken HUMC (the "First Notice"). In a notice dated November 25, 2019, Hoboken MPT wrote:

> In accordance with Section 10.5(a) of the LLC Agreement, [Hoboken] MPT hereby provides notice to [Hoboken HUMC] . . . that [Hoboken MPT] has received an Offer to purchase all of its Membership Interest on the terms and subject to the conditions set forth in the [First EPA]. [Hoboken MPT] requests that [Hoboken HUMC] either (i) exercise the [right of first refusal] to purchase all of [Hoboken MPT's] Membership Interest on the same terms set forth in the [First EPA] in accordance with Section 10.5 . . . , or (ii) waive the [right of first refusal] by signing this letter as indicated below.[18]

Hoboken HUMC responded to the First Notice by asking Hoboken MPT for "any offer, term sheet, expression of interest or similar document or communication

---

[17] *Id.* at 1.

[18] Am. Compl. Ex. D, at 1–2.

submitted by Alaris Health, Avery Eisenreich or any of their respective affiliates to purchase any equity interests in [Hoboken] Opco."[19]  Hoboken MPT did not respond.

### E.    The Second EPA and Second Notice

The plaintiffs filed this litigation on December 4, 2019.  With their initial filing, they moved for expedited proceedings and sought a temporary restraining order to preserve the status quo and enforce Hoboken HUMC's first-refusal right.

The day after the plaintiffs commenced this litigation, Hoboken MPT purported to withdraw the First Notice.  In response, Hoboken HUMC again sought information concerning the "facts and circumstances relevant to the bona fide offer that Hoboken MPT received in connection with what ultimately became the [First] EPA."[20]

On December 11, 2019, Hoboken MPT and Alaris executed a second Equity Purchase Agreement (the "Second EPA"), reflecting a purchase price of $8,275,000 for the Membership Interest.  The Second EPA did not condition the Membership Interest Sale on the Real Estate Sales, which had already closed.

That same day, Hoboken MPT sent notice of the Second EPA to Hoboken HUMC (the "Second Notice").  Hoboken MPT wrote:

> [Hoboken MPT] and Alaris have executed a letter
> agreement that withdraws and terminates all prior offers
> and agreements with respect to Alaris' purchase of the

---

[19] Am. Compl. ¶ 136.

[20] *Id.* ¶ 160.

9

Membership Interest. . . . As such, the [Second EPA] is the only pending offer from Alaris to purchase the Membership Interest.[21]

Hoboken MPT further stated:

> In accordance with Section 10.5(a) of the LLC Agreement, [Hoboken MPT] hereby provides notice to [Hoboken HUMC] . . . that [Hoboken MPT] has received an Offer to purchase all of its Membership Interest on the terms and subject to the conditions set forth in the [Second EPA]. [Hoboken MPT] requests that [Hoboken HUMC] either i) exercise the [right of first refusal] to purchase all of [Hoboken MPT's] Membership Interest on the same terms set forth in the [Second EPA] in accordance with Section 10.5 . . . , or (ii) waive the [right of first refusal] by signing this letter as indicated below.[22]

## F.   This Litigation

On December 13, 2019, the plaintiffs amended their complaint and sought another temporary restraining order enjoining any sale under the Second EPA.[23]  On December 23, 2019, the Court entered an order temporarily restraining Hoboken MPT and Alaris from consummating the Membership Interest Sale and tolling the fifteen-day period for Hoboken HUMC to respond to the Second Notice.[24]  The Court also granted the plaintiffs' motion to expedite as to four claims:

---

[21] Am. Compl. Ex. G, at 1; *see also* Am. Compl. Ex. I (letter from Alaris to Hoboken MPT confirming the "withdrawal and termination of the [First EPA] and any and all Prior Offers").

[22] Am. Compl. Ex. G, at 1–2.

[23] Am. Compl.; Dkt. 30, Pls.' Mot. for TRO; Dkt. 31, Br. in Supp. of Pls.' Mot. for Expedited Proceedings & Mot. for TRO.

[24] Dkt. 47, Order Resolving Pls.' Mot. for a TRO.

10

- Count I for breach of Hoboken Opco's LLC Agreement, asserted against Hoboken MPT;

- Count II for breach of Hoboken Propco's LLC Agreement, asserted against MPT of Hoboken Hospital;

- Count IV for breach of Christ Propco's LLC Agreement, asserted against Eisenreich;

- Count IX for tortious interference with Hoboken HUMC's rights under Hoboken Opco's LLC Agreement, asserted against Eisenreich, Alaris, SB Hoboken, and WTFK Bayonne.[25]

All defendants filed answers and moved for judgment on the pleadings.[26] The MPT Defendants moved for judgment on the pleadings as to Counts I and II.[27] The Eisenreich Defendants moved for judgment on the pleadings as to Counts IV and IX.[28] The Court held oral argument on May 28, 2020.[29]

---

[25] Dkt. 46, Order Granting Pls.' Mot. for Expedited Proceedings.

[26] Dkt. 81, Answer, Affirmative Defenses & Countercls. of Defs.' MPT of Hoboken TRS, LLC, MPT of Hoboken Hospital, LLC, & MPT of Bayonne, LLC; Dkt. 77, The Eisenreich Defs.' Answer & Verified Countercls. to Pls.' First Am. Verified Compl.

[27] Dkt. 88, MPT Defs.' Mot. for J. on the Pleadings; Dkt. 89, MPT Defs.' Opening Br. in Supp. of Their Mot. for J. on the Pleadings; Dkt. 181, Pls.' Answering Br. in Opp'n to the MPT Defs.' Mot for J. on the Pleadings with Respect to the Expedited Claims ("Pls.' MPT Answering Br."); Dkt. 189, Defs. MPT of Hoboken TRS, LLC, MPT of Hoboken Hospital, LLC, & MPT of Bayonne, LLC's Reply to Pls.' Answering Br. to Mot. for J. on the Pleadings ("MPT Defs.' Reply Br.").

[28] Dkt. 78, The Eisenreich Defs.' Mot. for J. on the Pleadings; Dkt. 79, The Eisenreich Defs.' Br. in Supp. of Mot. for J. on the Pleadings; Dkt. 182, Answering Br. in Opp'n to the Eisenreich Defs.' Mot for J. on the Pleadings with Respect to the Expedited Claims; Dkt. 190, Eisenreich Defs.' Reply Br. in Further Supp. of Their Mot. for J. on the Pleadings with Respect to the Expedited Claims.

[29] Dkt. 202, Video Conference of the Oral Arg. on the MPT Defs.' Mot. for J. on the Pleadings & the Eisenreich Defs.' Mot. for J. on the Pleadings.

While the defendants' motion was pending, the parties pressed forward with expedited discovery. To deliver timely guidance, this decision focuses on Count I, which concerns the first-refusal right and transfer restrictions under Hoboken Opco's LLC Agreement (the "LLC Agreement"). The remainder of the defendants' motions will be resolved separately.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 12(c), a motion for judgment on the pleadings may be granted where "no material issue of fact exists and the movant is entitled to judgment as a matter of law."[30] In deciding a Rule 12(c) motion, the Court may consider the pleadings and the documents they incorporate by reference.[31] The Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party.[32] However, a "court need not blindly accept as true all allegations, nor must it draw all inferences from them in [the non-moving party's] favor unless they are reasonable inferences."[33]

In Count I, Hoboken HUMC claims that Hoboken MPT breached the first-refusal right and transfer restrictions in the LLC Agreement. "Under Delaware law,

---

[30] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[31] *OSI Sys.*, 892 A.2d at 1090.

[32] *Id.*

[33] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999) (internal quotation omitted), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

12

the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[34]

## A.     The First-Refusal Right

The first-refusal right is found in Section 10.5 of the LLC Agreement.  With bracketed numbers added to aid this analysis, Section 10.5 provides:

> Notwithstanding the general restriction to Transfer set forth in Section 10.1(a) hereof . . . a Member desiring to Transfer [1] all or any portion of its Membership Interests (a "Selling Member") to [2] a Person other than such Member's Affiliate or another Member must first [3] obtain from such person a bona fide written offer to purchase the Membership Interests, stating that the terms and conditions upon which the purchase is to be made, and the consideration offered (the "Offer").
>
> The recipient of the Offer (the "Offeree") must [4] notify the General Manager who will notify the other Members who will have the right to purchase all (but not less than all) of the Membership Interests proposed to be sold [5] upon the same terms and conditions stated in the Offer.[35]

The parties' principal disputes center on the fourth and the third elements. Tailored to this case, the first question is whether the scope of a qualifying offer, as established by the phrase "the same terms and conditions," encompasses the Real Estate Sales.  The second question is whether a qualifying offer can be withdrawn such that the Second EPA can replace the First EPA, or whether any letter of intent

---

[34] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[35] Am. Compl. Ex. A § 10.5(a).

or term sheet issued prior to the First EPA is the qualifying offer. This decision refers to these issues respectively as the scope issue and the qualifying-offer issue.

### 1. The Scope Issue

The parties do not dispute that the deal memorialized in the First EPA triggered the first-refusal right and that it was a package deal—that is, a sale of both the Membership Interest and the Real Estate.[36] The parties also do not dispute that the sales were cross-conditioned in the First EPA. The parties dispute the implications of the package deal on the scope of the first-refusal right.

Hoboken MPT seeks to limit the scope of the first-refusal right to the Membership Interest. It argues that Section 10.5 does not expressly encompass any properties other than the Membership Interest because on its face, Section 10.5 addresses the sale of "*Membership Interests*" only, and Section 10 as a whole is titled and concerns "Transfer of *Interest*."[37]

Hoboken HUMC maintains that its first-refusal right encompasses the entire package deal. It argues that it is entitled to acquire the Membership Interest on the "same terms and conditions" as the qualifying Offer, and thus it is entitled to purchase the Real Estate.

---

[36] For the sake of analysis, this section assumes that the First EPA is the operative qualifying offer, although it is reasonably conceivable that there was a prior qualifying offer that involved a similar package and involved similar cross-conditions, as discussed in the next section.

[37] Am. Compl. Ex. A § 10 (emphasis added).

Delaware courts apply the objective theory of contracts, giving "words their plain meaning unless it appears that the parties intended a special meaning."[38] "The critical issue for the Court to decide . . . is what the shared intentions of the contracting parties were when they entered the Agreement."[39] In determining the intention of the parties entering into an agreement, "courts must read the specific provisions of the contract in light of the entire contract."[40] "This principle of construction, known as the whole-text canon, stems from the theory that context is the primary determinant of meaning."[41]

In *USA Cable v. World Wrestling Federation Entertainment, Inc.*, this Court applied the whole-text canon to derive a rule for determining the scope of a first-

---

[38] *Encore Energy P'rs*, 72 A.3d at 104.

[39] *Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *1 (Del. Ch. Apr. 27, 2015).

[40] *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913–14 (Del. 2017); *see Viking Pump*, 148 A.3d at 648 (describing that, under Delaware law, a court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions" (quoting *Salamone*, 106 A.3d at 368)); *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan . . . ."); *id.* at 1114 (noting that it is a "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions"); *see also Borealis Power Hldgs., Inc. v. Hunt Strategic Util. Inv., L.L.C.*, — A.3d — , 2020 WL 2630929, at *5–6 & n.22 (Del. May 22, 2020) (analyzing a right of first refusal using the plain language approach to contract interpretation and confining its analysis to the four corners of the relevant contract).

[41] *See Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *5 (Del. Ch. Jan. 29, 2019) (internal quotations omitted).

refusal right.[42]   There, the plaintiff contracted with defendant World Wrestling Federation Entertainment, Inc. to televise four of the defendant's narrative wrestling series (the "Series").[43]   The parties' agreement contained a first-refusal right that gave the plaintiff the right to match terms offered by a third party.[44]   The defendant received an offer from a third-party, which included televising the original Series and much more, such as additional specials, a new drama series, XFL football coverage, a multi-million dollar advertising campaign, radio syndication, pay-per-view events, print publishing, and theme park events.[45]   The defendant notified the plaintiff of this new offer pursuant to the plaintiff's first-refusal right,[46] and the plaintiff purported to match the offer by striking certain elements and accepting others.[47]   The defendant rejected the plaintiff's proposal, and the plaintiff sued to enforce the first-refusal right.[48]

In a reverse of the plaintiffs' position here, the plaintiff in *USA Cable* argued for a narrow interpretation of the first-refusal provision, insisting that its scope only extended to the subject matter of the existing contract and that the plaintiff thus

---

[42] 2000 WL 875682 (Del. Ch. June 27, 2020), *aff'd*, 766 A.2d 462 (Del. 2000).

[43] *Id.* at *1–2.

[44] *Id.* at *2

[45] *Id.* at *6.

[46] *Id.* at *7.

[47] *Id.*

[48] *Id.*

16

needed only match provisions that were "with respect to the Series."[49]  The

defendant argued for a broad interpretation, insisting that the plaintiff was obligated

to match every provision of the qualifying offer.[50]

In a post-trial decision, the Court adopted the plaintiff's interpretation,

although it ultimately entered judgment in favor of the defendant.  Reading the

agreement as a whole, the Court observed that

> it is unreasonable to conclude that a right of first refusal
> clause in a contract . . . would require the holder of the
> right of first refusal to match a package offer from a third-
> party for various properties that vastly exceed the scope of
> the property under the contract giving rise to the first
> refusal right.  Nothing in the record suggests that a
> contrary scenario was *reasonably* in the minds of the
> parties at the time of drafting.[51]

The Court concluded that "[t]he scope of the right is limited to the subject matter of

the Agreement in which the right exists."[52]  The Delaware Supreme Court later

---

[49] *Id.* at *8.

[50] *Id.*

[51] *Id.* at *9.

[52] *Id.*  To be fair, the Court reached its holding regarding the scope of the first-refusal right after conducting multiple analyses that could each be viewed as sufficient.  The Court first analyzed the plain language of the first-refusal provision, focusing on a phrase that limited the first-refusal right to arrangements "with respect to any or all of the Series."  *Id.* at *8–10.  Based in part on the "with respect to" phrase, the Court held that "[t]he holder of the right of first refusal must match all terms contained in a third party offer *directly related to the Series itself.*"  *Id.* at *9 (emphasis added).  These included "licensing fees for the Series, advertising splits for the Series," and the like; they did not include "the XFL, theme park events, and motion pictures, for example."  *Id.*  The Court further examined parol evidence introduced at trial when construing the scope of the first-refusal right.  *Id.* at *12.  Without

17

affirmed the trial court's decision.[53]

This decision adopts the well-reasoned rule of *USA Cable*, which is that the scope of a first-refusal right shall be construed as limited to the subject matter of the agreement containing the right, unless the parties expressly agree otherwise.[54]

Under the rule of *USA Cable*, the MPT Defendants' restrictive interpretation is the only reasonable one. At base, it is unreasonable to conclude that the parties to the LLC Agreement intended Section 10.5 to extend to any unburdened property included in a package deal, such as the Real Estate. This conclusion stems from the nature and content of the agreement in question. Under the Delaware LLC Act, a limited liability company agreement is "any agreement . . . written, oral, or implied, of the member or members *as to the affairs of a limited liability company and the*

---

diminishing the significance of these additional analyses, I find the application of the whole-text canon independently persuasive and generally applicable.

[53] *See* 766 A.2d at 465–68.

[54] The parties' dispute over the implications of a package deal on the scope of a first-refusal right is not new; this issue has vexed many courts before this one. *See generally* Bernard Daskal, Note, *Rights of First Refusal and the Package Deal*, 22 Fordham Urb. L.J. 461 (1995) [hereinafter *Package Deal*] (describing the problems posed by the package deal in the first-refusal right context and collecting cases and secondary sources on this issue). Although at least one court has concluded that the right holder "is entitled to specific performance on the entire package," that outcome has been criticized. *Id.* at 490; *see also USA Cable*, 766 A.2d at 468. The author of *Package Deal* reports that the majority of courts considering this issue have awarded "the right holder specific performance on the burdened property alone." *Package Deal* at 469–70. Thus, *USA Cable* falls in line with what seems to be the majority rule. I qualify this statement with the phrase "what seems to be," because my conclusion stems from a note published in 1995 found through independent research. The parties are free to brief this issue in future submissions if they believe that the exercise would be worthwhile.

18

*conduct of its business*."[55]   It "provides the basic organizational structure for a Delaware limited liability company"[56] and governs the "entity's internal affairs," including the relationship among the LLC and its members.[57]   It would be unreasonable for members to include within an LLC Agreement a first-refusal right extending to property neither owned by the LLC nor any of its members, as the plaintiffs' theory would require.  The plaintiffs cite to no case that reached this conclusion.

To be sure, the plaintiffs attempt to characterize the Real Estate as within the subject matter of the LLC Agreement.  The plaintiffs observe that the LLC Agreement contemplates that Hoboken Opco *could* hold real property related to Hoboken Hospital[58] and that the "lease" of the real estate is mentioned several times in the LLC Agreement.[59]  But whether Hoboken Opco could one day own real estate does not render the Real Estate within the subject matter of the agreement.  And the reference to a "lease" reflects a legal relationship between Hoboken Opco and a

---

[55] 6 *Del. C.* § 18-101(9) (emphasis added).

[56] Robert L. Symonds Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies*, § 4.01[C] at 4-11 (2d ed. 2017).

[57] *Id.*

[58] Pls.' MPT Answering Br. at 31.

[59] *Id.* at 32 (citing Am. Compl. Ex. A ¶ 1 at 7).

19

third-party regarding the Real Estate, a relationship that is the subject matter of a separate agreement, *i.e.*, the referenced "lease."

Although this decision adopts a narrow interpretation of the scope of the first-refusal right, the package deal nevertheless cuts against Hoboken MPT in ways sufficient to foreclose judgment on the pleadings. The main problem is that the nature of the package deal prevents the Court from isolating the "terms and conditions" in the First EPA that are specific to the Membership Interest Sale. It is reasonably conceivable that the Real Estate Sales affected the terms and conditions of the Membership Interest Sale. The First EPA presents them as part of a package deal, and they were negotiated as such. By packaging them as a single deal, the defendants obscured the Court's ability to determine which terms and conditions need to be matched.

It is reasonably conceivable that Alaris tied its valuation of the Membership Interest to the value of owning both the Membership Interest and the Real Estate. It is also reasonably conceivable that the parties allocated the total price for all of the assets not based on the underlying value of each asset, but based on considerations that were affected by the nature of the package deal. For example, in order to optimize tax or other benefits, it is reasonably conceivable that Alaris allocated a portion of the purchase price to the Membership Interest that exceeded the underlying value of the Membership Interest. In effect, Alaris could maximize the

20

value of the total package irrespective of the value of its contents by overpaying for one asset and underpaying for the others. Thus, whether the $8,275,000 purchase price reflects the true value of the Membership Interest by itself is a disputed issue of fact that is not properly resolved on a motion for judgment on the pleadings.

### 2. The Qualifying-Offer Issue

The MPT Defendants seek to avoid the complications arising from the package deal by arguing that the operative offer is the Second EPA, which included only the Membership Interest Sale and not the Real Estate Sale. They say that the First EPA was abandoned and the First Notice was withdrawn. The plaintiffs respond that the First Notice created an option contract that could not be withdrawn during the fifteen-day period set forth in Section 10.5. They alternatively argue that neither the First EPA nor the Second EPA is a qualifying offer because neither are offers; rather, both are fully executed agreements. They say that it is reasonably conceivable that some qualifying offer predated the First EPA and that Hoboken MPT breached its first-refusal obligations by failing to timely notice that qualifying offer pursuant to Section 10.5.

As a matter of black-letter law, an offeror may withdraw its offer before acceptance.[60] Option contracts are an exception to the general rule.[61] Courts disagree as to whether a first-refusal right, once triggered by a qualifying offer, gives rise to a revocable offer or creates an irrevocable option for the duration of the exercise period.[62] According to the MPT Defendants, Delaware law has not resolved this issue. They urge the Court to follow *LIN Broadcasting Corp v. Metromedia, Inc.*,[63] in which a New York court concluded that first-refusal provisions permit revocable offers and should not be construed as option contracts.

In *LIN Broadcasting*, the potential seller revoked an offer made pursuant to a first-refusal provision after the third-party buyer revoked the qualifying offer.[64] The

---

[60] *Montray Realty Co. v. Arthurs*, 105 A. 183, 186 (Del. 1918) ("It is fundamental law that an offer may be revoked at any time before acceptance."); *Restatement (Second) of Contracts* § 36(1)(c) (Am. Law Inst. 1981) (explaining that an offeree's power of acceptance may be terminated by "revocation by the offeror"); *id.* § 42 ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.").

[61] *Walsh v. White House Post Prods., LLC*, 2020 WL 1492543, at *5 (Del. Ch. Mar. 25, 2020) (collecting authorities on common law rule and describing option contract exception); 1 *Williston on Contracts* § 5.16 (4th ed. 2020) ("*Williston*") ("Although an option contract is by definition binding as a contract, it is also an offer, and like other offers, its terms must be accepted in order to make the main contract binding.").

[62] 1 *Farnsworth on Contracts* § 3.29, at 3-209 (4th ed. Supp. 2019) ("*Farnsworth*") ("Courts have disagreed as to whether a right of first refusal, once triggered by a third party's offer, gives a power to make a contract that survives even if the transaction with the third party is abandoned." (citing *LIN Broadcasting* and noting inconsistency among state courts)).

[63] 542 N.E.2d 629 (N.Y. 1989).

[64] *Id.* at 632. The seller and third-party offeror had reached a final agreement in *LIN Broadcasting*, and the parties did not dispute that this final agreement triggered the first-

22

holder of the first-refusal right nevertheless purported to exercise its right and sought specific performance.[65] The right holder argued "that a first refusal offer, once made, is irrevocable for the period specified in the first refusal clause."[66] In rejecting that argument, the court reasoned that the purpose of a first-refusal right is not served by treating the right as an option contract:

> The obvious effect of the right of first refusal is to give to the nonselling party a power to control and restrict the other party's right to sell to a third party. The clause itself operates as a restriction by preventing a party from making a sale without first making the first refusal offer. When, as here, the selling party has fully complied with its obligations under the first refusal clause by not selling without first making the required offer, the nonselling party has received the bargained-for performance. The intended effect of the clause as a means of restricting or preventing a sale to a third party has been realized. There is no basis for requiring the selling party to render more than its promised performance, as LIN would have us do, by keeping the offer open for the period specified in the first refusal clause, thus giving the first refusal offer all of the attributes of an option.[67]

Put differently, the purpose of a first-refusal provision is to prohibit the transfer of property absent compliance with the provision. The purpose is not to force the owner to sell.

---

refusal right. *Id.* They did not litigate whether the plaintiff right holder was entitled to notice of a more preliminary qualifying offer. *Id.*

[65] *Id.*

[66] *Id.* at 633.

[67] *Id.*

At this stage, the parties have not sufficiently briefed the merits of following *LIN Broadcasting*. The MPT Defendants first cited *LIN Broadcasting* in their reply brief, so the plaintiffs did not have a chance to respond in briefing.[68] Further, *Farnsworth* teaches that state laws are not in accord on this issue.[69]

Even assuming that this Court were to follow *LIN Broadcasting*, there is a factual dispute as to whether the qualifying offer was withdrawn. The plaintiffs contend that Hoboken MPT and Alaris partially performed under the terms of the First EPA by closing on the Real Estate Sales on November 5, 2019. It is reasonably conceivable that any efforts to disentangle the package deal through the Second EPA were undertaken with an eye toward this litigation.[70] Thus, a question of fact remains as to whether the Second EPA reflects the true "terms and conditions" of the Membership Interest Sale.

The plaintiffs raise another question concerning the qualifying-offer issue. They argue that neither the First EPA nor the Second EPA qualifies as an offer because both are final, executed agreements and not offers.

---

[68] MPT Defs.' Reply Br. at 3.

[69] *Farnsworth* § 3.29, at 3-209.

[70] *See Union Oil Co. of Cal. v. Mobil Pipeline Co.*, 2006 WL 3770834, at \*13 n.58 (Del. Ch. Dec. 15, 2006) ("The law is clear that when a first refusal right is involved, all deal terms must be commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive right.").

24

Generally, an offer triggering a first-refusal right is one that the seller receives and intends to accept.[71] To identify a qualifying offer, a court must determine whether the seller intended to accept the offer. If a seller intends to accept the qualifying offer, the seller may not do so prior to honoring the first-refusal right.[72] It is "a violation of duty for [the seller] to make a contract to sell on any terms, even though the contract is expressly made 'subject to' the [first-refusal right]. If the court should hold otherwise, it would thereby extract most of the 'teeth' of [the first-refusal] right."[73] Thus, a qualifying offer is necessarily something short of a binding agreement.

The LLC Agreement defines "Offer" as a "bona fide written offer to purchase the Membership Interests, stating the terms and conditions upon which the purchase is to be made."[74] Breaking it down, the defined term Offer means an offer that (1)

---

[71] *Corbin* § 11.3, at 468–69 (a qualifying offer in the context of a first-refusal right is an offer that a seller intends to accept).

[72] *Williston* § 67:89 (noting the first-refusal right "limits the right of the owner to dispose freely of its property by compelling the owner to offer it first to the party who has the first right to buy. *Nor may the owner accept an offer made by a third party*" (emphasis added)); *Corbin* § 11.4, at 489 (explaining that a first-refusal right is "a right that the [holder] shall be given an option to buy *before any other offer is made or accepted*" (emphasis added)).

[73] *Corbin* § 11.3, at 480; *see also id.* (explaining that an owner's "acceptance of that offer without first offering to [the right holder] on the same terms is a breach"); *Kaplan v. Beach Dev. Corp.*, 1988 WL 55324, at *5 (Del. Super. May 23, 1988) (noting that a first-refusal right required the sellers "not to accept an offer for the purchase of [the property] made to it by a third party").

[74] Am. Compl. Ex. A § 10.5(a).

is "bona fide," (2) is in writing, (3) seeks to purchase Membership Interests, and (4) "states the terms and conditions upon which the purchase is to be made."[75] Of these four elements, the second and third are not disputed. The first and fourth require further examination. One legal dictionary defines "bona fide offer" as "[a]n offer that creates a binding contract upon acceptance" or "a valid offer made in good faith, [which] is an offer that is sufficient to bind both parties if it is accepted."[76] Under general principles of contract law, an offer made "in good faith" is one that is not designed "for the purpose of inducing a rejection."[77] For an offer to be "binding upon acceptance," it must contain sufficiently definite terms.[78] In this latter sense, the definition of "bona fide offer" informs the meaning of the fourth element. That

---

[75] *Id.*

[76] *Bona Fide Offer*, Wolters Kluwer Bouvier Law Dictionary (2012) ("A bona fide offer must be made in good faith with the intent that it be honored if accepted, be made in clear and unambiguous terms by a party ready, willing, and able to perform its promise in a timely manner, offering appropriate value in its offer for the promise sought from the offeree, and without conditions of duress, fraud, or misrepresentation.").

[77] *Corbin* § 11.3, at 482. *Cf. Restatement (Second) of Contracts* § 26 ("A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.").

[78] *Restatement (Second) of Contracts* § 33(1) ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain."); *id.* § 33(2) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."); *see Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) (adopting *Restatement (Second) of Contracts* § 33 for determining whether terms of offer are "sufficiently definite").

is, for an offer to be "bona fide," it *must* state sufficiently definite "terms and conditions."[79]

Putting it all back together, the defined term "Offer" means something that the seller intends to accept but had not yet accepted. It means an offer, made in writing, to purchase at least some Membership Interests, which the third party makes to induce acceptance rather than rejection, and which states sufficiently definite terms and conditions so as to be binding upon acceptance. As the plaintiffs argue, this definition could conceivably include a letter of intent or preliminary term sheet, provided that the document contains sufficiently definite terms and otherwise meets the definition of an Offer.[80] This definition does not foreclose the seller and third-party from negotiating the terms of an offer before the first-refusal right is triggered; to the contrary, it requires it.

---

[79] The MPT Defendants appear to argue that this definition must be construed to require that *all* terms of the agreement be reduced to writing, including provisions such as choice of law and forum. They rely on this Court's holding in *USA Cable* that such provisions were "undoubtedly material." 2000 WL 875682, at *19. The court in *USA Cable,* however, made that finding post-trial upon a fully developed record, not on a motion for judgment on the pleadings.

[80] The plaintiffs argue that their interpretation of "Offer" finds support in an agreement signed by the same parties contemporaneously with an amendment to the LLC Agreement. That document, the LLC Agreement of Hoboken Propco, defines "bona fide written offer" to include "a binding or non-binding letter of intent, term sheet, proposal, or [written evidence] otherwise outlining the proposed terms of a bona fide offer." Am. Compl. Ex. B. § 6(a).

27

Applying this definition to the facts of this case, it should be obvious that there are many factual disputes foreclosing judgment on the pleadings as to what constitutes the operative qualifying offer. The MPT Defendants argue that, under the definition of "Offer," the First EPA was the first qualifying offer triggering the first-refusal right because it was the first offer that the MPT Defendants intended to accept.

The MPT Defendants might ultimately prove that contention true, and it is possible that the First EPA is the earliest qualifying Offer. At this stage, the Court cannot accept the moving party's factual contentions as true if reasonable inferences can be drawn in the non-moving party's favor.[81] It is reasonably conceivable that the First EPA is a final, memorialized contract, not a bona fide offer. The plaintiffs allege that the agreement appears to have been signed and thus accepted.[82] They allege that the parties began performing aspects of the First EPA before the First Notice was delivered, as suggested by the fact that defendants closed on the Real Estate Sales that were a condition precedent to closing under the First EPA. They further allege that aspects of the First EPA were intended to bind Alaris immediately, such as Alaris's consent right discussed in the next section and Alaris's agreement

---

[81] *OSI Sys.*, 892 A.2d at 1090.

[82] The MPT Defendants raise a factual dispute by contending that neither the First EPA nor the Second EPA were fully executed agreements. *See* MPT Defs.' Reply Br. at 11–12. But the Court cannot take defendants' word for it, as factual disputes must resolve in the plaintiffs' favor for the purpose of this motion. *OSI Sys.*, 892 A.2d at 1090.

to indemnify Hoboken MPT for any lawsuit concerning the first-refusal right.[83] These allegations make it reasonably conceivable that the First EPA was not a qualifying offer, but rather, a binding agreement.

It is further reasonably conceivable that some written document reflecting the sufficiently definite terms was created at an earlier time. In fact, the Eisenreich Defendants admit in their Brief in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Expedited Proceedings that "[i]n October of 2019, Alaris and [Hoboken MPT] entered into a letter of intent at the request of Alaris pursuant to which Alaris offered to purchase [the Membership Interest]."[84] Thus, the plaintiffs have identified questions of fact regarding whether some written document evidencing the material terms of a qualifying offer was created prior to the First EPA. The existence of this document could have implications for the triggering of the first-refusal right.[85]

---

[83] Am. Compl. Ex. E § 11.2 (stating that Alaris will indemnify Hoboken MPT for "any claims, demands, causes of action, or proceedings by [Hoboken HUMC] which arises out of or relates solely to the transactions contemplated in this Agreement or the Purchase Agreements").

[84] Dkt. 38 at 8.

[85] The plaintiffs also argue that Section 10.5 contains implicit timing requirements necessitating notice prior to closing. Pls.' MPT Answering Br. at 33–35. They argue that this implied notice provision required Hoboken MPT to deliver the First Notice prior to closing on the package deal. I agree that Section 10.5 requires that notice be given before an aspect of the qualifying offer is accepted by performance of otherwise. *See Corbin* § 11.3, at 492–93 (suggesting that the "right to receive notice of a third-party offer" is a "distinct legal right . . . included in" first-refusal right); *id.* (reasoning that "where the

## B. The Transfer Restrictions

Section 10.1 provides that "no Member shall make, permit or suffer any Transfer of all or any portion of his/its Membership Interest ([*sic*] or any governance rights or financial rights, voluntarily, by operation of law, or otherwise, except where the same is expressly required or permitted under this Agreement."[86]

Hoboken HUMC claims that Hoboken MPT breached Section 10.1 of the LLC Agreement by providing consent rights to Alaris concerning amendments to the LLC Agreement. The First EPA specifically provides that Hoboken MPT may not consent to any amendments to the LLC Agreement "without the prior written consent of [Alaris]."[87] The plaintiffs further allege that Hoboken MPT "advised in writing . . . that Plaintiffs were required to speak to Eisenreich (not the MPT Defendants) in connection with Hoboken MPT's interest in [Hoboken] Opco."[88]

Hoboken HUMC's claim raises interesting questions of law that the parties have not briefed, such as whether the transfer of consent rights of this nature constitutes a transfer of governance rights. Although Section 10.1 is specifically identified in the Amended Complaint,[89] the MPT Defendants did not address

---

grantor is trying to evade a duty under the right of first refusal, there may be no such communication"). The implications of this holding can be developed at a later stage.

[86] Am. Compl. Ex. A § 10.1(a).

[87] Am. Compl. ¶ 148.

[88] *Id.* ¶ 184.

[89] *Id.* ¶ 148.

Section 10.1 in their opening brief. This is a sufficient basis to deny the defendants' motion for judgment on the pleadings as to Hoboken HUMC's claim for breach of Section 10.1.

Open questions of fact provide another basis for denying the motion. In their reply brief, the MPT Defendants argue that they are entitled to judgment on the pleadings on this issue because the First EPA was withdrawn and the Second EPA has not been consummated as a consequence of the temporary restraining order.[90] As discussed above, however, questions of fact remain as to whether the First EPA was actually withdrawn and replaced by the Second EPA. For these reasons, judgment on the pleadings as to this aspect of Count I is denied.

## III. CONCLUSION

In sum, the plaintiffs have raised issues of disputed fact sufficient to avoid judgment on the pleadings. A question of fact remains as to what constituted a qualifying Offer and whether there was a qualifying Offer prior to the First EPA. Even if the First EPA is the first qualifying Offer, a question of law remains as to whether the first-refusal right issued in connection with the First EPA could be withdrawn, and a question of fact remains as to whether it was actually withdrawn. Questions of fact also remain on the scope issue concerning the terms and conditions applicable to the Membership Interest Sale. It cannot be determined on the pleadings

---

[90] MPT Defs.' Reply Br. at 13–14.

31

whether the First EPA or any prior qualifying offer properly valued the Membership Interest or whether that value was infected by the different components of the package deal. It is also difficult to isolate other material terms relevant to the Membership Interest Sale given that the deal was negotiated as a package deal. Finally, questions of law and fact remains as to the claim for breach of the transfer restrictions.

For these reasons, the MPT Defendants' motion as to Count I is DENIED.