**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

April 11, 2025

Michael A. Barlow, Esquire
Quinn Emanuel Urquhart & Sullivan, LLP
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801

David E. Wilks, Esquire
Wilks Law, LLC
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805

RE:  *Shareholder Representative Services, LLC v. Alexion Pharmaceuticals, Inc.,*
Civil Action No. 2020-1069-MTZ

Dear Counsel,

As you know, I issued a post-trial opinion on September 5, 2024 (the "Memorandum Opinion") that left unresolved each side's claims based on problems with drug materials Alexion acquired from Syntimmune in connection with a merger. [1]  Syntimmune had promised in Section 4.13(a) of the merger agreement that materials "for human use or anticipated to be for human use" were and would continue to be manufactured in material compliance with regulations and FDA guidance governing good manufacturing practices ("cGMP"). [2]  Alexion asserts

---

[1] *S'holder Representative Servs. LLC v. Alexion Pharms., Inc.*, 2024 WL 4052343 (Del. Ch. Sept. 5, 2024).  This letter assumes familiarity with that opinion and uses its defined terms and citation formats.

[2] Merger Agr. § 4.13(a).

Syntimmune broke that promise. Alexion sought indemnification,[3] and then brought a claim for breach of Section 4.13.[4] Specifically, Alexion asserts that drug product lots AJ8794A, AK3858, AF6404A and AG3356A, and drug substance lots[5] CMC-L-0125 and CMC-M-0009, were not manufactured in compliance with cGMP in breach of Section 4.13.[6] SRS sought a declaratory judgment as to Alexion's request for indemnification.[7] Those related claims remain pending.

---

[3] Alexion demanded indemnification from SRS on November 1, 2019, for losses it incurred to replace Syntimmune's contaminated drug supply, pursuant to Sections 8.1(a) and 8.3(d) of the merger agreement. *See* JX 1202.

[4] D.I. 158 ¶¶ 109–19 [hereinafter "Counterclaims"].

[5] Drug substance refers to the active ingredient that provides a therapeutic effect, while drug product refers to the final product. *See* Drugs@FDA Glossary of Terms, https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms (last visited Apr. 9, 2025); 21 C.F.R. § 314.3; Marshall Tr. at 1864–65.

[6] ALXN Ans. Br. 58–64; ALXN Op. Br. 21–37; JX 2303 at Interrog. Resp. No. 23. Alexion broadly contends that "[w]ith the exception of DS Batch CMC-K-0068 (filled into DP lot AG7907A), all DS and DP that Alexion acquired from Syntimmune was noncompliant with cGMP." ALXN Op. Br. 31 n.123.

Alexion asserts in a footnote that CMC-M-0010 was cGMP noncompliant. ALXN Ans. Br. 62 n.243. But Alexion stated in its interrogatory responses that "batch CMC-M-0010 was intended solely for testing and engineering purposes for developing 150 mg/mL drug product, and was not intended for human use." JX 2303 at 21 n.21; *see also* JX 2462 at 36 n.40 (same). Alexion's expert Paul Marshall disagreed, again in a footnote, and had a different theory: "although it is true that Alexion ultimately used CMC-M-0010 as an engineering batch for drug product filling . . . Syntimmune intended CMC-M-0010 as a cGMP batch for human use at the time of its manufacture." JX 2502 at 35 n.69. But Alexion did not amend its representation to SRS in its interrogatory responses. I hold it to its initial position. CMC-M-0010 was not intended for human use.

[7] D.I. 155 ¶¶ 279–83.

This letter addresses a gating issue: whether all the drug substance lots and drug product lots Alexion identified were "for human use or anticipated to be for human use" and so were encompassed by Section 4.13.[8] This letter concludes all disputed lots were at least anticipated to be for human use.

## I. BACKGROUND[9]

Alexion acquired Syntimmune, and its drug supply, in 2018. Syntimmune was a privately held company that was developing an anti-FcRn drug from a molecule that would become known as ALXN1830.

A year before the merger, Syntimmune entered into various "cGMP manufacturing" work orders with one of its manufacturers, AGC Biologics.[10] AGC Biologics agreed to manufacture drug substance lots, including CMC-L-0125 and

---

[8] This issue was plagued by the ills of simultaneous briefing. SRS's answering brief asserted Alexion did not dispute that the lots were not for human use. *See* SRS Ans. Br. 52–53. But Alexion did just that in its own answering brief. ALXN Ans. Br. 59.

[9] This post-trial letter relies on the facts found in the Memorandum Opinion, and finds additional facts by a preponderance of the evidence. Alexion bore the burden of proving its counterclaim by a preponderance of the evidence. *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).

[10] *See* JX 382.02; JX 202; JX 203; JX 172; JX 949 at 6; *see also* JX 97. AGC Biologics was then known as CMC Biologics A/S. JX 232; JX 202.

CMC-M-0009,[11] "to support" Syntimmune's "Phase I/II clinical trials."[12] Syntimmune then contracted with Patheon Manufacturing Services LLC to manufacture drug product lots. Patheon manufactured AJ8794A for the purpose of being "clinical supply . . . for a Phase II study."[13] AJ8794A was later "assigned [to a] HV IV Study to be initiated in the Netherlands in October [2018] and [was] in storage . . . to replenish [that] study if required."[14] AK3858 was "manufactured for [drug product] stability testing."[15]

The merger agreement was entered into on September 28, 2018, and the merger closed on November 2.[16] As of closing, Syntimmune had completed one Phase 1 clinical trial, had two more underway, and had planned a fourth.[17]

---

[11] *See* JX 382.02; JX 202; JX 203; JX 172; JX 949 at 6; JX 1342; JX 603 at 27; *see also* JX 97.

[12] JX 202 at 4; JX 203 at 2; JX 172 at 1, 6; JX 949 at 6; *see also* JX 97 at 2.

[13] JX 275 at 2; JX 298 at 1.

[14] JX 668 at 4.

[15] JX 784 at 82.

[16] JX 1; JX 765.

[17] *Alexion*, 2024 WL 4052343, at *15. "Phase 1 clinical trials are typically the first time the drug is administered to humans." *Id*. at *5.

### A. Alexion Negotiated Representations And Warranties, Then Quickly Experienced Problems With Syntimmune's Drug Supply.

At the time of negotiations, Syntimmune competitors were further along in developing multiple other anti-FcRn products.[18] "To be successful, Alexion believed the drug had to get to market quickly and be differentiated from its competitors."[19] Alexion wanted to "be very aggressive in [its] timeline" in bringing the drug to market: "time was of the essence."[20]

Alexion negotiated for representations and warranties assuring Syntimmune's drug supply was developed in compliance with federal regulations. Section 4.13(a) of the Merger Agreement states, in relevant part:

> The Company's product candidates for human use or anticipated to be for human use (the "*Product Candidates*") are being, and at all times have been, developed, tested, labelled, manufactured, stored, imported, exported and distributed, as applicable, in compliance in all material respects with the FDCA and applicable implementing regulations issued by the FDA, the EMA and any other applicable Governmental Entities, including, as applicable, those requirements relating to the FDA's current good manufacturing practices, good laboratory practices, good clinical practices, investigational use, pre-market approval and applications to market a new pharmaceutical product, except as disclosed on Section 4.13(a) of the Disclosure Schedule.[21]

---

[18] *Id.* at *15; JX 518 at 2.

[19] *Alexion*, 2024 WL 4052343, at *10.

[20] Sarin Tr. at 952–53; *see also Alexion*, 2024 WL 4052343, at *5.

[21] Merger Agr. § 4.13(a).

At closing, Alexion knew AJ8794A "was contaminated with a particulate, so that [it] could not be used."[22] AJ8794A remained under investigation and would not be "released into clinic until lot investigation [was] completed."[23] Alexion also knew multiple other lots were pending release.[24] Indeed, CMC-L-0125 and CMC-M-0009 were under investigation and "[p]ending final release,"[25] but had ongoing "[i]ssue[s]" as the deal closed in November.[26]

As of closing, AK3858 was "pending release" and its "limited leftover" supply was earmarked for "clinical inventory."[27] But shortly after closing, Alexion determined that AK3858 was also contaminated and experienced "particle issue[s]" during manufacturing.[28] Alexion had planned to use that lot to resupply its clinical trials, and was forced to pause a study.[29] A few weeks later, participants in one of

---

[22] Ledwith Tr. at 1029; JX 722 at 3.

[23] JX 784 at 82.

[24] JX 668 at 3.

[25] *Id.*; Luosey Tr. at 820–21; *see also* JX 784 at 11; JX 2846.

[26] JX 804 at 4.

[27] JX 784 at 82.

[28] JX 804 at 5; JX 817; JX 2846; Ledwith Tr. at 1030–31.

[29] Ledwith Tr. at 1030–31; JX 843 at 3, 10.

Alexion's clinical studies started exhibiting infusion-related reactions after injection of drug products, including AF6404A.[30]

Alexion's clinical studies "were paused in February [2019] pending an investigation into the drug supply" Alexion acquired from Syntimmune.[31] Alexion investigated Syntimmune's chemistry, manufacturing, and controls, and determined that all the drug product lots and drug substance lots it acquired from Syntimmune were unusable,[32] including drug product lot AG3356A which was released from manufacturing and planned for use in clinical trials.[33] Drug product lots AJ8794A[34] and AK3858,[35] and drug substance lots CMC-L-0125 and CMC-M-0009, were never released and never used in clinical trials.[36] In November 2019, Alexion sought indemnification under the merger agreement.[37]

### B. Litigation Ensues.

Plaintiff and counterclaim defendant SRS represents Syntimmune's former

---

[30] Ledwith Tr. at 1035; JX 923 at 42, 64; JX 2303 at Interrog. Resp. No. 23.

[31] *Alexion*, 2024 WL 4052343, at *15.

[32] Ledwith Tr. at 1038–41.

[33] JX 804 at 7, 13; JX 983 at 8; JX 2846.

[34] This was renamed from CMC-L-0079. Counterclaims ¶ 54, n.6.

[35] This was filled from CMC-L-0125.

[36] JX 804 at 4–5; Ledwith Tr. at 1038–41; JX 1202.

[37] JX 1202.

stockholders under the merger agreement. SRS sued Alexion for breaches of the merger agreement's milestone and commercially reasonable efforts obligations, and for a declaratory judgment on Alexion's indemnification claim.[38] Alexion filed its amended counterclaims on April 26, 2022.[39] Alexion claims Syntimmune failed to properly manufacture its drug supply in accordance with current cGMP, and seeks indemnification for the related losses it incurred to investigate, remediate and remanufacture that supply, among other damages.[40]

Section 4.13 requires cGMP compliance only for "product candidates for human use or anticipated to be for human use."[41] The parties dispute whether the challenged lots were "for human use or anticipated to be for human use."[42]

---

[38] D.I. 155.

[39] *See generally* Counterclaims.

[40] *Id.* ¶¶ 109–19; ALXN Op. Br. 37–44.

[41] Merger Agr. § 4.13(a).

[42] SRS's post-trial opening brief took the position that AJ8794A, CMC-L-0125 and CMC-M0009 were the only lots Alexion challenged. SRS Op. Br. 85 n.23. Indeed, those three lots were the only lots identified in the Counterclaims. But Alexion's post-trial opening brief challenged other lots, including AK3858, AF6404A, and AG3356A, and SRS responded to those challenges in its answering brief and raised no objection. SRS Ans. Br. 52–67. It appears SRS shifted from its opening position. Alexion asserts that "[d]uring discovery, additional cGMP violations became evident, which Alexion disclosed in interrogatory responses, and SRS took fact and expert deposition discovery thereon." ALXN Ans. Br. 62, n.242. After a review of Alexion's interrogatory responses, expert reports, pre-trial briefing, and trial testimony, I agree. At the very least, these issues were tried by consent. *See* Ct. Ch. R. 15(5)(b)(2).

## II.   ANALYSIS

The first step in evaluating whether the challenged lots were "for human use or anticipated to be for human use" per Section 4.13 is to construe that language.  To do so, "we apply our well-established principles of contract interpretation."[43]  "In construing a contract, our goal is to give effect to the intent of the parties."[44]  "The court's task is to fulfill the parties' shared expectations at the time they contracted."[45]  "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[46]  "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[47]  "Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language."[48]  "If a contract is unambiguous, extrinsic evidence may

---

[43] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023).

[44] *Id.* at 144.

[45] *Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at *5 (Del. Ch. Mar. 28, 2022) (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted)).

[46] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[47] *Alexion*, 2024 WL 4052343, at *29 (quoting *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[48] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).

not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[49]

The merger agreement does not define "for human use" or "anticipated to be for human use." I construe the plain meaning of this language "in accordance with its ordinary dictionary meaning."[50] Merriam-Webster defines "anticipate" to mean "to look forward to as certain."[51] The Cambridge dictionary defines it as "to imagine or expect that something will happen."[52] Based on these ordinary meanings, a challenged lot was "anticipated to be for human use" if it was expected to be used by or in humans. Section 4.13 represents that product candidates expected to be used by or in humans were compliant in all material respects with cGMP while "developed, tested, labelled, manufactured, stored, imported, exported and distributed, as applicable."[53]

---

[49] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[50] *USA Cable v. World Wrestling Fed'n Ent., Inc.*, 766 A.2d 462, 474 (Del. 2000); *see also Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

[51] *Anticipate*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/anticipate#dictionary-entry-1 (last visited Apr. 10, 2025).

[52] *Anticipate*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/anticipate (last visited Apr. 10, 2025).

[53] Merger Agr. § 4.13(a).

My next task is to apply that language to the lots at issue. I begin with the released lots: AF6404A and AG3356A. SRS does not dispute that released batches were for human use or anticipated for human use. AF6404A and AG3356A were both released from manufacturing. AF6404A was used in humans in clinical trials and AG3356A was clinical supply. They were actually used, or planned for use, on humans. They were for human use.

Next, the unreleased lots: AJ8794A, AK3858, CMC-L-0125 and CMC-M-0009. Syntimmune's contracts, internal investigation documents, and due diligence materials produced to Alexion reflect the unreleased lots were manufactured to support Phase 1 and/or Phase 2 clinical trials in humans.[54] CMC-L-0125 and CMC-M-0009 were manufactured to support human clinical trials.[55] AK3858's limited leftovers were earmarked for clinical use.[56] AJ8794A was assigned to a study and stored to be used in a study.[57] At the very least, AJ8794A, AK3858, CMC-L-0125

---

[54] SRS contends that Alexion's expert "acknowledged that until a drug product is released, the sponsor has not represented that the drug is manufactured in conformance with GMP," and therefore it is not anticipated for human use until release too. SRS Op. Br. 84–85 (citing Elder Tr. at 1968–69). But Dr. Elder was talking about representations in the context of the FDA, not whether a product was for "human use" or "anticipated to be for human use" under the merger agreement.

[55] JX 202 at 4; JX 203 at 2; *see also* JX 97 at 2; JX 172 at 6.

[56] JX 784 at 82.

[57] JX 275 at 2; JX 298 at 1; JX 668 at 4.

and CMC-M-0009 were expected to be used in humans. They were anticipated for human use.

SRS asserts that because these lots were intercepted or quarantined before they were released or qualified for use in human trials, they were not even "anticipated" for human use.[58] AK3858, AJ8794A, CMC-L-0125 and CMC-M-0009 were subjected to quality investigations and were never released for use in clinical trials. But the merger agreement does not say the material must actually be "released" or used in clinical trials to be a product candidate under Section 4.13. They must only be expected to be used in humans. Indeed, the cGMP promise encompasses "develop[ment]" and "manufactur[ing]."[59] This makes sense: Alexion bought all of Syntimmune's drug supply with the goal of rapid development through clinical trials. Alexion bought a promise that the supply would be compliant.

Having concluded each challenged lot was at least anticipated to be for human use or actually for human use, I turn to next steps. In accordance with my instructions, the parties have identified potential experts to assist the Court under Delaware Rule of Evidence 706 in determining these lots' compliance with cGMP.[60]

---

[58] SRS Op. Br. 84–85.

[59] Merger Agr. § 4.13(a).

[60] *See* D.I. 381; D.I. 401; D.I. 402; D.I. 403.

The parties identified three issues on which they could not agree.[61]  My ruling on each follows.

(1)  The question posed to the expert shall be:  "Whether the Syntimmune drug product lots and drug substance lots Alexion has identified were manufactured in compliance in all material respects with the FDCA and applicable implementing regulations issued by the FDA, the EMA and any other applicable Governmental Entities, including, as applicable, those requirements relating to the FDA's current good manufacturing practices." This language tracks Section 4.13(a).  SRS properly understood my January 24 letter.

(2) The expert may be provided with the Memorandum Opinion.  It provides important procedural context.  I do not believe it would prejudice a cGMP expert against Alexion.  The expert may also be provided with this letter opinion and those considering the expert's appointment and role.

(3) The parties should not plan on rebuttal reports and additional depositions from their own experts.  This ruling is without prejudice to request such procedures for a specific issue.

---

[61] D.I. 402; D.I. 403.

The parties submitted two experts for *in camera* consideration. The Court selects Robert Sharpnack. The parties should confer with Mr. Sharpnack and submit a stipulated order of appointment.

## III. CONCLUSION

The challenged drug substance lots and drug product lots were either for human use or anticipated to be for human use. Section 4.13 applies. Alexion's breach of contract claim, and SRS's indemnification claim, march forward.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*